IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 10-cv-02862-PAB-KLM

DEAN CARBAJAL,

     Plaintiff,

v.

CARROL WARNER, in her individual capacity,
DAVID ROMERO, in his individual capacity,
JOE QUINTANA, in his individual capacity,
BILL RAILEY, in his individual capacity,
CHRIS WELDON, in his individual capacity,
BENJAMIN SCHROEDER, in his individual capacity,
GILBERTO LUCIO, in his individual capacity,
JAMES DIXON, in his individual capacity,
ADAM BARRETT, in his individual capacity,
JOEL SMITH, in his individual capacity,
JESSE REMBERT, in his individual capacity,
JAY LOPEZ, in his individual capacity,
MICHAEL O'NEILL, in his individual capacity,
CITY AND COUNTY OF DENVER, a political subdivision of the State of Colorado,
DARIN DESEL, Police Officer for the Denver Police Department, in his individual capacity,
FRED MCKEE, Sheriff for the Delta Sheriff's Department, in his individual capacity,
PERRY SPEELMAN, Police Officer for the Denver Police Department, in his individual capacity, and
JEFFREY WATTS, Investigator for the Second Judicial District, in his individual capacity,

     Defendants.

_____

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

     This matter is before the Court on the **Motion for Summary Judgment** [#694],[1] filed

---

[1] "[#694]" is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system

by Defendants Carrol Warner ("Warner"), David Romero ("Romero"), and Joe Quintana ("Quintana") (collectively, the "State Defendants"); on the **Motion for Summary Judgment** [#697], filed by Defendant Jeffrey Watts ("Watts"); on the **Motion for Summary Judgment** [#700], filed by Denver police officer Defendants Adam Barrett ("Barrett"), Darin Desel ("Desel"), James Dixon ("Dixon"), Jay Lopez ("Lopez"), Gilberto Lucio ("Lucio"), Michael O'Neill ("O'Neill"), Jesse Rembert ("Rembert"), Joel Smith ("Smith"), Perry Speelman ("Speelman") (collectively, the Denver Officer Defendants"), and the City and County of Denver (collectively, the "Denver Defendants"); and on the **Motion for Summary Judgment** [#714], filed by Defendants Bill Raley ("Raley"),[2] Chris Weldon ("Weldon"), Benjamin Schroeder ("Schroeder"), and Fred McKee ("McKee") (collectively, the "Delta Defendants").  Plaintiff, who proceeds in this matter as a pro se litigant,[3] did not file Responses.  *See Order* [#753] at 17-19 (determining that Plaintiff's repeated delay tactics justified denying yet another extension of time in which to file Responses); *Order* [#774] (overruling Plaintiff's objections to Order [#753]).

The Motions have been referred to the undersigned for recommendation [#695, #704, #707, #716] pursuant to 28 U.S.C. § 636(b) and D.C.COLO.LCivR 72.1(c).  The

---

(CM/ECF).  This convention is used throughout this Recommendation.

[2] Although this Defendant is identified by Plaintiff as "Bill Railey," the correct spelling of his last name is "Raley."  *Aff. of Raley* [#715-7] ¶ 1.  The Court uses the correct spelling throughout this Recommendation.

[3] The Court must construe the filings of a pro se litigant liberally.  *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  However, the Court should not be the pro se litigant's advocate, nor should the Court "supply additional factual allegations to round out [the pro se litigant's] complaint or construct a legal theory on [his] behalf."  *Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997) (citing *Hall*, 935 F.2d at 1110).  In addition, pro se litigants must follow the same procedural rules that govern other litigants.  *Nielson v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994).

Court has reviewed the Motions, the entire case file, and the applicable law, and is sufficiently advised in the premises.  For the reasons set forth below, the Court respectfully **RECOMMENDS** that the State Defendants' Motion [#694] be **GRANTED**, that Defendant Watts' Motion [#697] be **GRANTED**, that the Denver Defendants' Motion [#700] be **GRANTED in part and DENIED in part**, and that the Delta Defendants' Motion [#714] be **GRANTED**.

## I. Summary of the Case[4]

Plaintiff's lawsuit involves many claims asserted against many Defendants and encompasses many separate events spread over a number of years.  These events ultimately culminated in multiple state court criminal prosecutions against Plaintiff as well as his present incarceration.  In the Third Amended Complaint, Plaintiff alleged widespread conspiratorial conduct by law enforcement personnel, including several probation officers. In the interest of clarity, the Court provides the material facts as they pertain to each group of Defendants (i.e., the Delta Defendants, the State Defendants, Defendant Watts, and the Denver Defendants) in the Analysis section below prior to addressing each of the four separate Motions.  Here, only a very brief outline of the events underlying this lawsuit is provided.

_____

[4] The following recitation and subsequent analysis construes the evidence in the light most favorable to Plaintiff, as the nonmovant. *Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1186 (10th Cir. 2015) ("We . . . recit[e] all summary-judgment evidence in the light most favorable to . . . the nonmovant.").  Although Plaintiff submitted no evidence in response to the Motions, the Court considers the facts alleged in Plaintiff's Third Amended Complaint [#254] because a pro se litigant's sworn complaint is equivalent to an affidavit for purposes of summary judgment.  *See Adams v. Dyer*, 223 F. App'x 757, 764 n.7 (10th Cir. 2007) (citing *Conaway v. Smith*, 853 F.2d 789, 792 (10th Cir. 1988)); *see also Harris v. Denver Health Med. Ctr.*, No. 11-cv-01868-REB-MEH, 2013 WL 441539, at *7 (D. Colo. Jan. 31, 2013) (citations omitted); *West v. Yeaton*, No. 09-cv-01268-MSK-KLM, 2011 WL 42140, at *3 (D. Colo. Jan. 6, 2011).

In 2001, as part of a plea deal resolving six criminal cases pending against Plaintiff, Plaintiff entered *Alford* pleas to charges including sexual assault II, possession of a schedule II controlled substance, and bail violation. *People v. Carbajal*, 198 P.3d 102, 104 (2008). For the latter two violations, Plaintiff was sentenced to four years confinement and three years mandatory parole. *Id.* For sexual assault II, the Court imposed a deferred judgment with four years supervision set to begin after his release from confinement. *Id.*

Plaintiff was confined in prison from August 30, 2001, until July 26, 2004. *Id.* Upon his release, he began a mandatory three-year supervised parole period. *Id.* According to the Delta County District Court's order, his deferred judgment supervision began on the date of his release and was to continue until July 26, 2008. *Id.* However, "on April 25, 2006, the People filed a petition to revoke [Plaintiff's] deferred judgment and impose a judgment and sentence." *Id.* After a hearing on July 14, 2006, the Delta County District Court ordered that Plaintiff's deferred judgment would run through July 14, 2010. *Id.* On August 18, 2006, Plaintiff was the subject of a violent encounter with some of the Delta Defendants, which ultimately resulted in Plaintiff signing a document agreeing to a further extension of the deferred judgment. The events underlying the claims against the three State Defendants, i.e., the probation officers, involve alleged fabrication of inculpatory evidence and destruction of exculpatory evidence, all of which occurred shortly after (or slightly overlapping with) the events underlying the claims asserted against the Delta Defendants.

Late at night on April 28, 2009, some of the Denver Officer Defendants were dispatched to respond to a noise complaint. Ultimately, Plaintiff was arrested and charged with Disturbance of the Peace and Interference. On October 13, 2009, two unidentified

officers went to Plaintiff's residence and forced their way inside with guns drawn while they searched the residence, although Plaintiff was not arrested at that time.  On April 5, 2010, Plaintiff was arrested due to allegations of domestic violence against his girlfriend and charged with Possession and Distribution of a Controlled Substance.  On August 24, 2010, Defendant Watts hit Plaintiff with his vehicle near 22nd Street and Glenarm Place in Denver, but Plaintiff "escaped" and was not arrested at that time.  On August 28, 2010, Plaintiff was apprehended and arrested by some of the Denver Defendants.

Four constitutional claims asserted pursuant to 42 U.S.C. § 1983, each with multiple subparts, are pending in this action: (1) malicious prosecution, including conspiracy to commit malicious prosecution; (2) unreasonable search and seizure, including conspiracy to commit unreasonable search and seizure; (3) excessive force; and (4) municipal liability on each of these claims with respect to the City and County of Denver.  *See generally Third Am. Compl.* [#254] at 16-23.  Plaintiff seeks compensatory and injunctive relief.  *See id.* at 25.

## II.  Standard of Review

The purpose of a motion for summary judgment pursuant to Fed. R. Civ. P. 56 is to assess whether trial is necessary.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). An issue is genuine if the evidence is such that a reasonable jury could resolve the issue in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it might affect the outcome of the case under the governing substantive law.  *Id.*

The burden is on the movant to show the absence of a genuine issue of material fact.  *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998) (citing *Celotex,*

477 U.S. at 323).  When the movant does not bear the ultimate burden of persuasion at

trial, the "movant may make its prima facie demonstration [of the absence of a genuine

issue of material fact] simply by pointing out to the [C]ourt a lack of evidence for the

nonmovant on an essential element of the nonmovant's claim." *Id.* at 671.  If the movant

carries the initial burden of making a prima facie showing of a lack of evidence, the burden

shifts to the nonmovant to put forth sufficient evidence for each essential element of his

claim such that a reasonable jury could find in his favor.  *See Anderson*, 477 U.S. at 248;

*Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321,

1326 (10th Cir. 1999), abrogation recognized by *Eisenhour v. Weber Cnty.*, 744 F.3d 1220,

1227 (10th Cir. 2014).  Conclusory statements based merely on conjecture, speculation,

or subjective belief are not competent summary judgment evidence.  *Bones v. Honeywell*

*Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).  The nonmoving party's evidence must be

more than "mere reargument of [his] case or a denial of an opponent's allegation" or it will

be disregarded.  *See* 10B Charles Alan Wright, et al., Federal Practice and Procedure §

2738 at 356 (3d ed. 1998).

Only documents that adhere to the evidentiary requirements of Fed. R. Civ. P. 56

may be considered for purposes of summary judgment.  Rule 56(c) provides that:

> (1) A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]
>> ...
> (3) Materials Not Cited. The court need consider only the cited materials, but it may consider other materials in the record.
> (4) Affidavits or Declarations. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that

would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c)(1)-(4).

### III. Analysis

As mentioned above, Plaintiff's remaining claims all fall under 42 U.S.C. § 1983.

Section 1983 provides, in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

"[T]he purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).

### A. The Delta Defendants' Motion

The four Delta Defendants (Raley, Weldon, Schroeder, and McKee) were employed as law enforcement personnel by the Delta County Sheriff's Department at times relevant to this lawsuit. *Motion* [#714] at 1. Plaintiff asserts claims against them for § 1983 malicious prosecution, including conspiracy to commit malicious prosecution. *See Third Am. Compl.* [#254] at 16-18.

As outlined above, Plaintiff was released from confinement on July 26, 2004, and began his mandatory three years of parole. *Carbajal*, 198 P.3d at 104. His deferred judgment supervision began on that date and was to continue until July 26, 2008. *Id.* However, Plaintiff's parole was revoked prior to late April 2006, and he was returned to confinement. *Id.* Plaintiff's violation of his parole was also a violation of the conditions of

his deferred judgment supervision, and "on April 25, 2006, the People filed a petition to revoke [his] deferred judgment and impose a judgment and sentence." *Id.* After a hearing held on July 14, 2006, the Delta County District Court ordered that Plaintiff's deferred judgment would not be revoked, but that his four years of deferred judgment supervision would be "restarted," i.e., his deferred judgment supervision would run from July 14, 2006 through July 14, 2010. *Id.* On August 18, 2006,[5] Plaintiff alleges a subsequent encounter with Defendants Raley and Schroeder, which ultimately caused Plaintiff to sign a document agreeing to the further extension of his deferred sentence. *See Third Am. Compl.* [#254] at 8. The Court discusses this encounter in more detail below.

In his deposition, Plaintiff discussed in detail the alleged physical coercion employed by the Delta Defendants in 2006 in order to get him to sign the document extending his deferred sentence.[6] *See generally Depo. of Pl.* [#715-5]. With respect to Defendant McKee, Plaintiff claims no physical coercion. *See Depo. of Pl.* [#715-5] at 351-52. However, with respect to Defendants Raley, Weldon, and Schroeder, Plaintiff's own testimony highlights the inconsistencies of his story.

With respect to Defendant Raley, Plaintiff first testified that on July 14, 2006, Defendant Raley placed handcuffs on him too tightly, to the extent that his hands went numb. *Id.* at 356-57. He then testified that Defendant Raley was not present on that date. *Id.* at 361 ("I don't believe Railey [sic] was present at the time [of the July 14, 2006

---

[5]   Although Plaintiff wrote "2011," in the Third Amended Complaint, this appears to be a clear scrivener's error and should be "2006." *Compare Third Am. Compl.* [#254] at 8 *with Ex. L, Depo. of Pl.* [#715-5] at 355.

[6]   Plaintiff did not seek medical treatment after any of his encounters with these officers. *Depo. of Pl.* [#715-5] at 363, 368-69.

incident].  I think it was another officer that took me over there. . . .  Keep in mind, Railey [sic] . . . he wasn't the one that escorted me, but he could have been present, because Railey [sic] for some reason was always in my court hearings. . . .  Most of the time.").

Plaintiff also testified that Defendant Raley "yanked" his shoulder on August 18, 2006.  *Id.* at 359 ("I believe [he injured] my shoulder, just the way he yanked me and pulled me out of the courtroom . . . ."), 361 ("[T]hat's when Railey [sic] was upset because I hadn't signed the actual stipulations of the deferred.").  He then testified that this occasion in August 2006 was when Defendant Raley placed the handcuffs on him too tightly, instead of that time in July 2006.  *Id.* at 362.

Plaintiff next testified that in November 2008,[7] Defendant Raley hit him on the head with a flashlight when Plaintiff was in Defendant Raley's office.  *Id.* at 356 ("[T]hat's where I was struck in the head, I think, with the flashlight in Railey's [sic] office."), 359 (". . . I don't believe Railey [sic] physically personally effectuated any physical force apart from [the August 2006 incident] until November 8th, when I was hit in the back of the head in his office when they were threatening me because of the lawsuits and because of the litigation.").  Plaintiff then testified that it was not Raley who hit him.  *Id.* at 363 ("I believe initially when I was let out of the cell block I was escorted by one of the officers, but I was taken to Captain Railey's [sic] office, but I was left there in a seat where I spoke with him, but I don't recall anybody being – anybody else being there, but it could have been – it might have been [Defendant] Weldon that was right behind me.") (. . . [N]ow that I recall,

---

[7]  The November 2008 incident does not appear to be discussed in Plaintiff's Third Amended Complaint, but because the Delta Defendants address the issue because it was raised in Plaintiff's deposition, the Court also briefly addresses it here.

I don't believe it was Railey that struck me with whatever the object was.  I think I believed

it was a flashlight.  It was actually Weldon . . . .").  In short, by the time Plaintiff completed

his deposition testimony, he said that "[T]he injuries and the assault from Railey [sic] is [sic]

only with the cuffs and only with the actual yanking [of the shoulder in August 2006]." *Id.*

at 363.

With respect to Defendant Weldon, Plaintiff first testified that Defendant Weldon

kicked him when he was on the ground in August 2006, before recanting that testimony.

*Id.* at 364 ("Oh, August 2006, if I remember correctly, him and Mr. Schroeder were both

involved in the actual – when they put me in a holding cell and they stripped me out and

they were threatening me initially.  And bear with me.  If I could just refresh my memory

here.  I don't recall specifically.  I remember both of them being involved in the actual initial

attack when I was in the cell, but I don't recall whether or not Weldon was actually one of

the actual individuals that was kicking me with Schroeder.  I remember Schroeder kicking

me, but I don't remember if Weldon was another one of the individuals that was involved

that kicked me from the side.  Yeah, the individual that engaged in the actual abuse was

Schroeder.  That's correct.  I don't believe Weldon was one of the individuals that did

that.").  Plaintiff then testified that it "might have been" Defendant Weldon standing behind

him in Defendant Raley's office and who hit him with a flashlight in November 2008.  *Id.* at

363.

With respect to Defendant Schroeder, Plaintiff testified that Defendant Schroeder

kicked him in the side in August 2006.  *Id.* at 366-67 ("I remember Schroder kicking me .

. . .  Initially I think I was thrown to the ground and I was like yanked over to the cell and

thrown to the ground, and then I was kicked repeatedly, both like in the front on my knees,

and then when I tried to pull my knees up, I remember kicking me in between the legs and kicking me in the groin. . . .   And I remember being kicked in the back, and then after that I was stripped and left in the cell naked.").  Plaintiff then changed his mind and said this incident occurred in July 2006.  *Id.* at 367 ("And, again, I don't recall whether or not that was the [sic] August 18th.  I think that – I think that physical assault that I was talking to you about was actually in July.  Yeah, it was in [sic] July 7, 2006, or within that approximate time.  That was my initial intake into Delta for the revocation when the proceedings began based on the illegal deferred [sic].").  Then Plaintiff stated that this type of assault happened in both July and August 2006.  *Id.* at 368.

As noted, the only claims remaining against the Delta Defendants are for malicious prosecution and conspiracy to maliciously prosecute in violation of the Fourteenth Amendment.  *Order* [#390] at 8-9.  "The Tenth Circuit has recognized the viability of malicious prosecution claims under § 1983."  *Mata v. Anderson*, 685 F. Supp. 2d 1223, 1249 (D.N.M. 2010) (internal quotation marks and citation omitted).  "Under our cases, a § 1983 malicious prosecution claim includes the following elements: (i) the defendant caused the plaintiff's continued confinement or prosecution; (ii) the original action terminated in favor of the plaintiff; (iii) no probable cause supported the original arrest, continued confinement, or prosecution; (iv) the defendant acted with malice; and (v) the plaintiff sustained damages."  *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008) (citation omitted).

Having thoroughly reviewed Plaintiff's assertions regarding the July 2006 actions of Defendants Schroeder, Weldon, McKee, and Raley, the Court finds no evidence that they caused Plaintiff's continued confinement or prosecution.  *See Third Am. Compl.* [#254] at

8.   There is no evidence that Plaintiff signed any document, that additional charges were brought against him, or that his confinement was lengthened in connection with any action taken by any Delta Defendant in July 2006.   *See Third Am. Compl.* [#254] at 8.   Although Plaintiff details various alleged abusive acts by the Delta Defendants, there is no evidence that these abusive acts caused him to sign a document or in any way contributed to the extension of his confinement.   *See id.*   The same is true of the November 2008 incident in which Plaintiff states he was hit on the head with a flashlight.   *See generally Depo. of Pl.* [#715-5].   Thus, these incidents cannot form the basis of a malicious prosecution claim due to lack of evidence relating to the first element, i.e., that any Delta Defendant caused Plaintiff's continued confinement or prosecution.   *See Wilkins*, 528 F.3d at 799.

> With respect to the August 18, 2006 incident, Plaintiff states:

> On August 18, [2006], at the conclusion of a hearing, [Judge] Charles Greenacre ran off the bench in a fury and slammed a pen and contract in front of Mr. Carbajal in a threatening manner demanding, "Just sign it."  In direct response, Railey [sic] forcefully grabbed Mr. Carbajal and transported him to the Detention Center, threatening him, "Your [sic] not getting the hint. You are going to sign that paper when we get back or else you're not going to be around very long.  We have special ways of dealing with people like you," and something to the effect, "People get sick and sometimes don't wake up," implying that they were going to kill him, and then turned Mr. Carbajal over to Deputy Schroeder, who in turn escorted him to a cell and threatened him, "Sign the paper and give it to me and write an apology to the court," and slammed Mr. Carbajal into a cell yelling, "That's what you get for pissing off the Judge."  Overwhelmed with fear of death and further physical abuse, Mr. Carbajal yielded to their demands and signed the contract, and prepared a letter of apology and turned it over to the Deputies.  It was this contract that the Prosecution and Probation Dept used as a crutch to extend the deferred sentence . . . .

*Third Am. Compl.* [#254] at 8.   However, despite Plaintiff's broad generalization that this "contract" was used to extend his deferred sentence, the Court can find no evidence in the record of any document signed in August 2006 and no evidence that any such document

was used to extend Plaintiff's deferred sentence.[8]  Thus, even taking as true Plaintiff's statements regarding the conduct of Defendants Raley and Schroeder in August 2006, the Court cannot find on this record that any document Plaintiff may have signed at this time caused his continued confinement or prosecution.  In other words, there is no evidence of a causal link between the alleged signing of an August 2006 document and the subsequent confinement or prosecution of Plaintiff.  Therefore, this incident cannot form the basis of a malicious prosecution claim due to lack of evidence related to the first element, i.e., that any Delta Defendant caused Plaintiff's continued confinement or prosecution.  *See Wilkins*, 528 F.3d at 799.  There is no genuine issue of material fact regarding malicious prosecution of Plaintiff by the Delta Defendants.

Finally, turning to the conspiracy claim, Plaintiff conceded in his deposition that "it would be fair to assume and reasonable that there is no evidence to support a conspiracy claim" with respect to the Delta Defendants.  *Depo. of Pl.* [#715-5] at 372-73.  The Court agrees.   The Tenth Circuit has stated that "a conspiracy to deprive a plaintiff of a constitutional or federally protected right under the color of state law" is actionable.  *Snell v. Tunnell*, 920 F.2d 673, 701 (10th Cir. 1990).  To establish the existence of a conspiracy, a plaintiff seeking redress must show that there was a "single plan, the essential nature and general scope of which [was] known to each person who is to be held responsible for its

---

[8]  Beyond Plaintiff's bare allegation to the contrary, the Court has been unable to find any evidence in the record establishing that Plaintiff's deferred judgment was further extended in August 2006.  In Plaintiff's state court appeal challenging the terms of the deferred judgment imposed by the state trial court, there is no mention of any hearing occurring on August 18, 2006, or any time in August 2006.  *See Carbajal*, 198 P.3d at 104-05.  The only extension which seems to have definitively occurred was in July 2006, but, as already discussed, Plaintiff does not assert that he signed any document at that time or that the Delta Defendants' actions caused the July 2006 extension to be imposed on him.  *See Third Am. Compl.* [#254] at 8.

consequences." Id. (internal citations omitted).  Given Plaintiff's concession and Tenth Circuit authority regarding § 1983 conspiracy claims, the Court finds that there is no genuine issue of material fact regarding a purported conspiracy and judgment should enter in favor of the Delta Defendants on this aspect of Plaintiff's malicious prosecution claim.

Accordingly, the Court **recommends** that judgment enter in favor of the Delta Defendants on the § 1983 malicious prosecution claim and on the § 1983 conspiracy to commit malicious prosecution claim.

**B.     The State Defendants' Motion**

Defendants Quintana, Romero, and Warner were employed as probation officers at the times relevant to this lawsuit.  The events underlying the claims against these three Defendants slightly overlap but mostly occurred shortly after the time frame set forth in claims Plaintiff made against the Delta Defendants.  Plaintiff asserts claims against the State Defendants for § 1983 malicious prosecution and § 1983 conspiracy to commit malicious prosecution.  *See Third Am. Compl.* [#254] at 16-18.  These claims remain "to the extent [Plaintiff] asserts claims against [Defendants Warner, Romero, and Quintana] based on allegations that these Defendants, acting as probation officers, knowingly and intentionally prepared and submitted false affidavits in support of contentions that [Plaintiff] had violated the terms of his parole and/or deferred judgment." *Order* [#229] at 8.  The only other remaining claims against any of the State Defendants are solely asserted against Defendant Quintana: (1) § 1983 unreasonable search and seizure, and (2) § 1983 conspiracy to commit unreasonable search and seizure.  *See Third Am. Compl.* [#254] at 19-20.

-14-

The evidence presented by the parties is as follows.  Defendant Quintana was a probation officer in the Seventh Judicial District from August 1999 until his retirement on December 31, 2009.  *Ex. A, Aff. of Quintana* [#694-1] ¶ 1.  He was assigned as Plaintiff's probation officer around July 18, 2006.  *Id.*  Plaintiff was still in jail at that time.  *Id.*  In February 2007, Plaintiff was released from custody.  *Id.*  Defendant Quintana did not play any role in Plaintiff's supervision prior to that time.  *Id.*  Upon Plaintiff's release from incarceration, he was to report to the Delta Probation Office and check in with Defendant Quintana.  *Id.* ¶ 2.  However, Plaintiff did not ever do so.  *Id.*  Thus, in April 2007, Defendant Quintana filed a probation complaint against Plaintiff due to Plaintiff's failure to report to the Delta Probation Office after his release from incarceration.  *Id.*; *Ex. A-1, Compl. of Probation Officer* [#694-2].

In September 2007, there was a hearing on Defendant Quintana's April 2007 probation revocation complaint.  [#694-1] ¶ 3.  At the hearing, Plaintiff signed the conditions of his probation.  *Id.*  Because Plaintiff was planning to live in Northglenn, Colorado, he was instructed to report to the Northglenn probation office, which is in the Seventeenth Judicial District.  *Id.*  Even though Plaintiff was reporting to the Northglenn office, Defendant Quintana was still responsible for his probation supervision.  *Id.*  While living in the Seventeenth Judicial District, Plantiff reported to Probation Officer Elisabeth Valerio ("Valerio").  *Ex. D, Aff. of Valerio* [#694-9] ¶ 2.  In February 2008, Ms. Valerio drafted and signed a violation report regarding Plaintiff, which she sent to Defendant Quintana.  *Id.* ¶ 3; *Ex. A-2, Violation Report* [#694-3]; [#694-1] ¶ 4.  To the best of Ms. Valerio's knowledge, nothing in this report was false.  [#694-9] ¶ 3.

On March 7, 2008, Defendant Quintana filed a second complaint for a probation

violation because Plaintiff had been arrested for trespassing and third degree assault, had failed to report for a scheduled office visit, and had stated that he would not comply with certain requirements of his probation.  *Ex. A, Aff. of Quintana* [#694-1] ¶¶ 5-6; *Ex. A-3, Probation Violation Compl.* [#694-4].  Defendant Quintana asserts that he never destroyed any exculpatory documents related to Plaintiff's probation revocation or deferred judgment, that he did not make any misrepresentations or falsities regarding Plaintiff, that he is unaware of anyone who destroyed exculpatory documents, and that he never participated in any search or seizure of Plaintiff's property.  *Id.* ¶¶ 7-14.

Defendant Romero was a probation officer from August 1999 until September 2006, at which time he became a supervising probation officer until he retired.  *Ex. B, Aff. of Romero* [#694-5] ¶ 1.  He supervised Defendant Quintana from September 2006 until Defendant Quintana's retirement in December 2009.  *Id.*  Defendant Romero's only direct contact with Plaintiff was when he took some telephone calls from Plaintiff when Plaintiff telephoned the probation office pursuant to the conditions of his probation.  *Id.* ¶¶ 4-6. Defendant Romero approved the probation complaints regarding Plaintiff which Defendant Quintana drafted in April 2007 and March 2008.  *Id.* ¶¶ 4, 7; *Ex. B-1, Compl. of Probation Officer* [#694-6]; *Ex. A-3, Compl. of Probation Officer* [#694-4].

On June 4, 2008, Defendant Romero received a telephone call from Defendant Lucio[9] (whom he had not known prior to receiving the call), from whom Defendant Romero learned that Plaintiff had been arrested on a domestic violence claim. [#694-5] ¶ 8.  After the call, Defendant Romero telephoned Assistant District Attorney Sheri Price asking her

---

[9] Although his Affidavit repeatedly spells the name as "Lucia," Defendant Romero appears to be referring to Defendant Gilberto Lucio, a Detective with the Denver Police Department.

if he should amend the complaint for revocation. *Id.* Based on this conversation, Defendant Romero amended the complaint two days later to revoke Plaintiff's probation. *Id.*; *Ex. B-2, Am. Probation Violation Compl.* [#694-7]. Although Defendant Quintana was Plaintiff's probation officer, Defendant Romero amended the complaint because Defendant Quintana was not in the office at that time. [#694-5] ¶ 8. Defendant Romero never destroyed any exculpatory documents related to Plaintiff's probation revocation or deferred judgment, does not know of the existence of any exculpatory documents regarding Plaintiff's probation revocation or deferred judgment, does not know of anyone who destroyed exculpatory documents, and never manufactured any evidence against Plaintiff. *Id.* ¶¶ 9-12.

Defendant Warner was the Chief Probation Officer for the Seventh Judicial District from 1995 until her retirement in 2012. *Ex. C, Aff. of Warner* [#694-8] ¶ 1. She did not directly supervise Defendant Quintana, who was directly supervised by Defendant Romero. *Id.* ¶ 2. Defendant Warner did not generally supervise probationers and did not supervise Plaintiff. *Id.* ¶ 3. She never drafted any affidavits regarding Plaintiff, never drafted any complaints to revoke Plaintiff's probation or his deferred judgment, never destroyed any exculpatory documents regarding Plaintiff's probation revocation or deferred judgment, does not know of the existence of any exculpatory documents regarding Plaintiff's probation revocation or deferred judgment, never manufactured any evidence against Plaintiff, does not know of anyone who manufactured any evidence against Plaintiff, was not involved in any probation revocation or deferred judgment regarding Plaintiff, never testified in court regarding Plaintiff, and was not involved in the imposition of any deferred judgment regarding Plaintiff. *Id.* ¶¶ 5-13.

Plaintiff asserts a § 1983 malicious prosecution claim against each of these three Defendants, Quintana, Romero, and Warner. *Third Am. Compl.* [#254] at 16-18. However, for purposes of summary judgment, Plaintiff's conclusory statements do little to create a genuine issue of material fact. *See generally Third Am. Compl.* [#254]. He states:[10]

> Warner, Romero, and Quintana, collectively worked closely together, sharing information and evidence, as well as strategized, and mutually agreed to alter the record to reflect a deferred sentence consecutive to the four year Dept. of Corrections sentence, as well to destroy any evidence that supported a concurrent factor, that would establish Mr. Carbajal's innocence. Once this fabricated sentence was in place, it was mutually agreed that Warner, Romero, and Quintana would attempt to enforce this false sentence on its prior terms and conditions and together the probation dept. and Prosecution would decide to revoke this deferred [sentence] without jurisdiction, inevitably resulting in the wrongful arrest, prosecution, and conviction of Mr. Carbajal without probable cause. . . .

> In 2005 the Prosecution . . . made a mutual decision to fabricate a false sentence in conjunction with the Probation Department–Warner, Romero, and Quintana . . . . [They] accomplished this by altering legal documents and destroying original documents to prevent the discovery of these fraudulent acts. . . . The Probation Department[, i.e.,] Warner, Romero, and Quintana . . . alter[ed] their files and destroy[ed] any documents that supported a concurrent factor. . . . Subsequently, the Probation Department–Warner, Romero, and Quintana, collectively decided to wrongfully revoke Mr. Carbajal's deferred sentence with full knowledge no jurisdiction or authority existed to support this act and drafted affidavits containing known falsities that Mr. Carbajal [was] on a deferred sentence for sexual assault and violated the terms and conditions with full knowledge Mr. Carbajal's deferred [sentence] had expired by operation of law and had completed this sentence, thereby instituting legal process maliciously, seeking Mr. Carbajal's arrest without probable cause.

> The application for revocation was first filed on April 25, 2006, and was obviously outside the applicable four year period established by statutory law

---

[10] The Court notes that, here and elsewhere in this Recommendation when Plaintiff's Third Amended Complaint is quoted, the Court does not consider as fact those aspects of the statements which are speculative, are based on subjective belief, or make legal conclusions. *See Bones*, 366 F.3d at 875. Rather, this information is included in the interest of completeness and in order to provide context for Plaintiff's claims and statements of fact.

that expired August 30, 2005. More [sic], Warner, Romero, and Quintana intentionally omitted material information, specifically that no jurisdiction existed or authority to revoke Mr. Carbajal's deferred sentence, as well as omitted the dates Mr. Carbajal entered his plea and statutory authority governing deferred sentences, to prevent a fair determination of probable cause to mislead judicial officers into establishing an improper timeline for the applicable four year period, in which, a petition can be filed to revoke a deferred sentence. Romero and Quintana's perjurious and distorted affidavits directed and ratified by Warner were presented with a malicious intent to manipulate judicial officers into issuing an arrest warrant for Mr. Carbajal without probable cause . . . .

*Id.* at 6-7.

These statements were enough to put the State Defendants on notice of the claims asserted against them during the motion to dismiss phase of this litigation. *See Order* [#229] at 5-6; *see Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012) (stating that in a complaint, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," and that the 12(b)(6) standard does not "require that the complaint include all facts necessary to carry the plaintiff's burden"). However, as explained below, these statements are insufficient to create a genuine issue of material fact precluding entry of summary judgment. *See Anderson*, 477 U.S. at 248 (stating that an issue is genuine if the evidence is such that a reasonable jury could resolve the issue in favor of the nonmoving party) (further stating that a fact is material if it might affect the outcome of the case under the governing substantive law).

First, and most importantly, there is no evidence that the State Defendants had any connection with the events of which Plaintiff complains, which occurred in 2005 and April 2006. The earliest contact for which there is evidence between Plaintiff and any of the State Defendants occurred around July 18, 2006, when Defendant Quintana was assigned

as Plaintiff's probation officer. *Ex. A, Aff. of Quintana* [#694-1] ¶ 1. Thus, there appears to be no evidence of personal participation in the events outlined by Plaintiff in the Third Amended Complaint. *See Bennett v. Passic*, 545 F.2d 1260, 1262-63 (10th Cir. 1976) (stating that personal participation is essential in a civil rights action); *Graham v. Connor*, 473 U.S. 159, 166 (1985) (stating that to establish personal participation, a plaintiff must show that each defendant caused the deprivation of a federal right).

Second, there is no evidence identifying or explaining any of the alleged destroyed evidence or exculpatory documents. As Plaintiff points out, spoliated evidence cannot be discovered. *See Third Am. Compl.* [#254] at 6. However, at the very least, trial of this claim requires proof that there actually was some evidence or document that may have exculpated Plaintiff. Yet without some evidence that this evidence ever existed, that it was exculpatory, and that it was actually spoliated, the Court cannot find that Plaintiff's bald assertions constitute evidence such that a reasonable jury could resolve the issue in his favor. *See Anderson*, 477 U.S. at 248; *Berget v. Gibson*, 188 F.3d 518 (Table), at *8 n.4 (10th Cir.1999) ("The court is never persuaded by bald assertions . . . bereft of authentication.").

Third, Plaintiff asserts a malicious prosecution claim, an unreasonable search and seizure claim, and conspiracy claims against Defendant Quintana with respect to events which allegedly happened in 2009. *See Third Am. Compl.* [#254] at 17, 19-20. Plaintiff here conclusorily states that "Mr. Carbajal discovered through the exercise of due diligence that Ed Gruninger and [Defendant] Lucio had worked together with [Defendant] Quintana, a former colleague, and took concerted efforts in furtherance of a mutual decision to compel the revocation of Mr. Carbajal's deferred sentence to convict and imprison him, a

contrivance derived from a preexisting conspiracy in Delta County." *Id.* at 9.   Plaintiff further states that "[o]n October 13, 2009, Lucio, Quintana, and Gruninger and/or two unknown officers conspired with one another, and other, officers of the District . . . to violate Mr. Carbajal's 4th and 14th Amend. rights by bringing about the invasion of Mr. Carbajal's home, following the customs and practices of the City of Denver . . . ." *Id.* at 13.   Plaintiff further complains of alleged illegal searches and seizures, fabrication of inculpatory evidence and probable cause, hiding of exculpatory evidence, and "perjurious statements presented to official bodies in order to bring about Mr. Carbajal's arrest, prosecution, and confinement out of malice." *Id.* at 17; *see also id.* at 19-20.   Plaintiff also includes Defendant Quintana in a claim for unreasonable search and seizure occurring on April 29, 2009, but there appear to be no facts, conclusory or otherwise, connecting Defendant Quintana to this event.  *See id.* at 19.

This portion of Plaintiff's claim suffers from the same problems as those described above.  First, although Defendant Quintana is named by Plaintiff, there is no evidence of any specific actions he took in 2009.  Thus, there is no evidence of personal participation in the events asserted.  *See Bennett*, 545 F.2d at 1262-63.   Further, Plaintiff's bald assertions regarding fabrication of evidence, perjurious statements, and so on do not constitute sufficient evidence such that a reasonable jury could resolve the issue in Plaintiff's favor.  *See Anderson*, 477 U.S. at 248.

In order for Plaintiff to succeed on his conspiracy claims against the State Defendants under 42 U.S.C. § 1983, he must "plead and prove not only a conspiracy, but also an actual deprivation of rights; pleading and proof of one without the other will be insufficient." *Snell*, 920 F.2d at 701.  Further, "[w]hile a deprivation of a constitutional right

is essential to proceed under a § 1983 claim, proof of an agreement to deprive will often require examination of conduct occurring prior to the deprivation." *Id.* at 701-02. To establish the existence of a conspiracy, Plaintiff must show that there was a "single plan, the essential nature and general scope of which [was] known to each person who is to be held responsible for its consequences." *Id.* (internal citations omitted). Here, as discussed above, there is no genuine issue of material fact regarding the § 1983 claims of malicious prosecution and unreasonable search and seizure against the State Defendants. Likewise, there is no genuine issue of material fact about the State Defendants' alleged participation in a conspiracy to violate these constitutional rights. *See id.* at 701.

Accordingly, the Court **recommends** that judgment enter in favor of the State Defendants on Plaintiff's claims of § 1983 malicious prosecution, § 1983 unreasonable search and seizure, and § 1983 conspiracy.

## C.  Defendant Watts' Motion

Plaintiff asserts claims against Defendant Watts for unreasonable search and seizure and conspiracy in violation of the Fourth Amendment regarding the August 28, 2010 incident and for excessive force regarding the August 24, 2010 and August 28, 2010 incidents. *See Third Am. Compl.* [#254] at 19-21.

Plaintiff's first interaction with Defendant Watts occurred in May 2010. *Depo. of Pl.* [#697-1] at 381 ("Now, as previously stated, my initial interaction with Watts wasn't until approximately in May in 2010 . . . ."). This interaction occurred in connection with a criminal case against Plaintiff related to domestic violence against his former girlfriend.[11] *Decl. of*

---

[11] The parties provide no additional information about this initial interaction, and it appears to be immaterial to resolution of Defendant Watts' Motion [#697].

*Watts* [#697-2] ¶¶ 3, 6.   On August 24, 2010, Defendant Watts attempted to serve a subpoena on Plaintiff's former girlfriend in connection with this case. *Id.* ¶ 3.   No one answered the door, so he returned to his car and watched the door. *Id.* ¶ 4.   While sitting there, Defendant Watts saw Plaintiff ride up on a bicycle and go to the door. *Id.*   No one answered the door for him either, and Plaintiff got back on his bicycle and rode away. *Id.* ¶ 5.   A few moments later, Plaintiff's former girlfriend exited her apartment. *Id.*   Defendant Watts immediately served her with the subpoena and asked her to confirm that Plaintiff had been at her front door. *Id.*   She did so, thus demonstrating that Plaintiff had violated a no-contact order with her. *Id.* ¶ 6.

Defendant Watts called for assistance and attempted to locate Plaintiff. *Id.* ¶¶ 6-7.   While patrolling, he saw Plaintiff riding down the street towards Defendant Watts' car. *Id.* ¶ 8.   Plaintiff saw Defendant Watts and recognized him as a law enforcement officer based on their previous interaction a few months before in May. *Depo. of Pl.* [#697-1] at 392-93. Plaintiff immediately turned into the nearest alley, and Defendant Watts drove after him. *Decl. of Watts* [#697-2] ¶¶ 8-9.   Somehow, Plaintiff, who was still riding a bicycle, collided with Defendant Watts' car.[12]   *Id.* at 393.   Plaintiff quickly recovered, rode away, and disappeared between two houses. *Id.*; *Decl. of Watts* [#697-2] ¶ 10.   Plaintiff could not be located and was not arrested until a few days later. *Depo. of Pl.* [#697-1] at 395; *Decl. of*

---

[12]   The details underlying how this event occurred are scant.   In the Third Amended Complaint, Plaintiff states that Defendant Watts "drove his car at Plaintiff [and] struck him, throwing him up on his car and to the ground," and that Defendant Watts then "exited the car and launched a [rock] at Plaintiff, . . . striking him in the head, causing . . . serious pain and bodily injury to his neck and back as well [as] to his head." [#254] at 14.   Defendant Watts states that Plaintiff instead either hit or came close to hitting a dumpster, and that he did not fully fall off of the bicycle. *Decl. of Watts* [#697-2] ¶ 9.   This issue of fact is not material for resolution of the Motion [#697].

-23-

*Watts* [#697-2] ¶¶ 10, 12.

Plaintiff testified at his deposition that the collision did not result in "such a severe injury that [it] required immediate . . . medical treatment.  It wasn't . . . life-or-death circumstances."  *Depo. of Pl.* [#697-1] at 394.  He did not seek any medical treatment after the collision on August 24 and before his arrest on August 28.  *Id.* at 395.  Plaintiff states that during that period:

> I was just allowing my body to heal naturally, because if anything – like I said, any of the remedial measures or any of the medical treatment that I've sought, if I could avoid going to a doctor and if I could avoid getting treatment, I would just deal with it naturally and just allow my body to either heal naturally or just rehabilitate it naturally with just the exercise and yoga techniques that I know, and apart from that, just meditation and prayer.

*Id.*  Although Plaintiff stated, "I might have hit my head," *id.* at 393, he did not discuss in his deposition any other specific injury he allegedly sustained as a result of this incident. Defendant Watts was not present at Plaintiff's arrest on August 28.  *Id.* at 396 (testifying that Plaintiff encountered Defendants Watts on May 10, 2010, August 24, 2010, and then not again until "in the courtrooms and in the hospital [and] in the . . . trial").

Defendant Watts asserts in part that he is entitled to qualified immunity on Plaintiff's constitutional claims.  *Motion* [#697] at 4-6.  A government official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a constitutional right that was clearly established at the time of the challenged conduct.  *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (citing *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011)). "The doctrine of qualified immunity shields government officials performing discretionary functions from liability for damages 'insofar as their conduct does not violate clearly established constitutional rights of which a reasonable person would have known.'"  *Boles*

*v. Neet*, 486 F.3d 1177, 1180 (10th Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity also offers protection from trial and other burdens of litigation. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  Because the defense of qualified immunity is raised, the Court considers whether the summary judgment evidence demonstrates that the defendant violated a constitutional right, and, second, whether that constitutional right was clearly established at the time of the alleged violation.  *See Saucier v. Katz*, 533 U.S. 194, 200-01 (2001).  "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id.* at 201.  However, the Supreme Court has held that courts are no longer required to address the inquiries in a particular order when evaluating a qualified immunity claim.  *Pearson v. Callahan*, 555 U.S. 223 (2009).

In order for Plaintiff's claims "to survive summary judgment, the record must contain facts that rebut the presumption of [each individual Defendant's] immunity from suit." *Medina v. Cram*, 252 F.3d 1124, 1130 (10th Cir. 2001); see *Anaya v. Crossroads Managed Care Sys., Inc.*, 195 F.3d 584, 593 (10th Cir. 1999) (denying summary judgment on qualified immunity where the "[t]he record supports the allegation that the plaintiffs' Fourth Amendment rights were violated"); *Bruning v. Pixler*, 949 F.2d 352, 356 (10th Cir. 1991) (noting that when "a government official raises the defense of qualified immunity in a motion for summary judgment, the plaintiff must produce facts sufficient to show both that the defendant's alleged conduct violated the law and that [the] law was clearly established when the alleged violation occurred"); *Rounds v. Corbin*, No. 04-cv-02532, 2009 WL 2982006, at *2-3 (D. Colo. Sept. 11, 2009) (denying qualified immunity on summary judgment because plaintiff "submitted more than unsupported allegations" to support his

claim); *Kelley v. City of Albuquerque*, 375 F. Supp. 2d 1183,1203 n.7 (D.N.M. 2004) (citing *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988)) (noting that to overcome the defendant's motion for summary judgment on the basis of qualified immunity, the "plaintiff must do more than rest on [his or her] own speculation or pleadings"). Defendant Watts asserts that the summary judgment evidence fails to demonstrate that he violated a constitutional right, and, even if he did violate Plaintiff's constitutional rights, the rights were not clearly established at the time of the alleged violations. The Court first examines whether Plaintiff's constitutional rights were violated.

The only remaining claim asserted against Defendant Watts which arises from the August 24, 2010 incident is for excessive force. "[A] plaintiff may only recover on an excessive force claim if [ ]he shows '(1) that the officers used greater force than would have been reasonably necessary to effect a lawful seizure, and (2) some actual injury caused by the unreasonable seizure that is not de minimis, be it physical or emotional.'" *Aldaba v. Pickens*, 777 F.3d 1148, 1161 n.3 (10th Cir. 2015) (quoting *Cortez v. McCauley*, 478 F.3d 1108, 1129 n.25 (10th Cir. 2007)). Defendant Watts contests both elements of this test.

The Court first examines the second element of this test, whether Plaintiff suffered an actual injury that was caused by the allegedly excessive force. The Tenth Circuit has made clear that an excessive force claim requires evidence of an injury that is not de minimis. *Bella v. Chamberlain*, 24 F.3d 1251, 1257 (10th Cir. 1994) ("[W]e have never upheld an excessive force claim without some evidence of physical injury."); *Christiansen v. City of Tulsa*, 332 F.3d 1270, 1279 (10th Cir. 2003) (stating that the defendants did not employ excessive force against the plaintiff in part because the plaintiff "suffered no

physical injuries as a direct result of the defendants' actions"); *Cortez*, 478 F.3d at 1129 ("We believe that a claim of excessive force requires some actual injury that is not de minimis, be it physical or emotional."); *Aldaba*, 777 F.3d at 1161 n.3 (citing *Cortez* for the proposition that a viable claim of excessive force requires an actual physical or emotional injury that is not de minimis).

Plaintiff has failed to present evidence of physical and emotional injuries that were allegedly caused by the incident underlying this claim. Plaintiff asserts in the Third Amended Complaint that he sustained pain and physical injury to his neck, back and head as a result of Defendant Watts' actions. However, he did not expand upon these conclusory statements in his deposition testimony (to the extent presented to the Court), and he has not presented an affidavit or other evidence that demonstrates a causal relationship between any injuries he sustained and the incident with Defendant Watts, as he must. *See, e.g.*, *Valencia v. De Luca*, 612 F. App'x 512, 519 n.7 (10th Cir. 2015) ("Although Mr. Valencia averred that there are medical records showing he suffered serious physical and emotional injuries, he provided no evidence of the nature or extent of any injuries such that they might bear on the reasonableness of the force used." (citing *Cortez*, 478 F.3d at 1129)); *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002) ("We include in our consideration information set out in the nonmovant's affidavit if that information is based on personal knowledge and sets forth facts that would be admissible in evidence. We do not consider conclusory and self-serving affidavits." (internal citations and quotation marks omitted)); *Stine v. Swanson*, No. 2008 WL 4330568, at *12 (D. Colo. Sept. 18, 2008) ("The Court finds that Plaintiff has shown that he suffered from a serious knee injury. . . . However, the Court finds that Plaintiff has failed to prove that the

temporary and relatively brief denial of a knee brace itself caused an injury from which Plaintiff did not already suffer.  Aside from Plaintiff's conclusory allegations, there is no evidence that his transportation to and from the hospital without a knee brace caused any additional injury whatsoever."); *Bones*, 366 F.3d at 875 (10th Cir. 2004) (holding that "[u]nsubstantiated allegations carry no probative weight in summary judgment proceedings"); *Anderson*, 477 U.S. at 249-50 (noting that "evidence [that] is merely colorable, or is not significantly probative" does not defeat summary judgment (citations omitted)).

Thus, the Court is presented only with one vague statement that Plaintiff sustained "serious" injury in connection with this incident, injury for which he undisputedly did not seek medical treatment.  Given this scintilla of evidence, the Court cannot find there is a genuine issue of material fact regarding whether Plaintiff sustained an actual injury that is more than de minimis, as is required for Plaintiff to state a Fourth Amendment excessive force claim. *See, e.g.*, *Duncan v. Quinlin*, No. 15-cv-00575-LTB, 2015 WL 1726802, at *4 (D. Colo. Apr. 13, 2015) (collecting cases with examples of de minimis injury) (citing *Askew v. Millerd*, 191 F.3d 953, 958 (8th Cir. 1999) (providing that: "Section 1983 is intended to remedy egregious conduct, and not every assault or battery which violates state law will create liability under it"); *White v. Roper*, 901 F.2d 1501 (9th Cir. 1990) (injuries of abrasions on wrists with no evidence of follow-up treatment failed to demonstrate excessive force); *Dockery v. Beard*, Civil No. 12-3317, 2013 WL 139624, at *2-3 (3d Cir. Jan. 11, 2013) (evidence of slight abrasions indicated that officers applied minimal force in a good-faith effort to maintain or restore discipline when prisoner failed to obey order); *Hill v. Kelly*, No. CIV.A. 96-1036, 1997 WL 638402 (E.D. Pa. 1997) (bruise and a cut on the plaintiff's thumb

-28-

as a result of the door closing on his thumb is the kind of de minimis imposition with which the Constitution is not concerned); *Barber v. Grow*, 929 F. Supp. 820 (E.D. Pa. 1996) (some cuts and bruises to arm and knee suffered as a result of guard pulling chair out from under inmate presents no set of facts that a reasonable jury could find intentional wanton behavior)).

Based on the foregoing, the Court finds that there is no genuine issue of material fact with respect to Plaintiff's injuries, whether they are more than de minimis, and whether they were caused by Defendant Watts on August 24, 2010. Thus, Defendant Watts is entitled to qualified immunity. Accordingly, the Court **recommends** that judgment enter in favor of Defendant Watts on Plaintiff's Fourth Amendment excessive force claim in connection with the August 24, 2010 incident.

Regarding the August 28, 2010 incident, Plaintiff asserts claims of Fourth Amendment excessive force, unreasonable search and seizure, and conspiracy to commit unreasonable search and seizure. *See Third Am. Compl.* [#254] at 19-21. Plaintiff's deposition testimony unequivocally demonstrates that Defendant Watts was not present during his arrest on August 28, 2010. *Depo. of Pl.* [#697-1] at 396 (testifying that he encountered Defendants Watts on May 10, 2010, August 24, 2010, and then not again until "in the courtrooms and in the hospital [and] in the . . . trial"). There are no non-conclusory, specific statements in the Third Amended Complaint which lead the Court to conclude otherwise or which demonstrate that Defendant Watts had any connection to the events of August 28, 2010. *See Graham*, 473 U.S. at 166 (stating that to establish personal participation, a plaintiff must show that each defendant caused the deprivation of a federal right). Thus, Defendant Watts is entitled to qualified immunity on this claim as well.

Accordingly, the Court **recommends** that judgment enter in favor of Defendant Watts on Plaintiff's claims of excessive force and unreasonable search and seizure in connection with the August 28, 2010 incident.

The Court next turns to the claim that Defendant Watts conspired with other law enforcement personnel to violate Plaintiff's right against unreasonable search and seizure. As stated above, in order to succeed on a conspiracy claim under § 1983, "a plaintiff must plead and prove not only a conspiracy, but also an actual deprivation of rights; pleading and proof of one without the other will be insufficient." *Snell*, 920 F.2d at 701. Thus, finding that judgment should enter in favor of Defendant Watts on the constitutional claims asserted against him, the Court further **recommends** that judgment enter in favor of Defendant Watts on Plaintiff's § 1983 conspiracy claims. *See Gehl Grp. v. Koby*, 838 F. Supp. 1409, 1419 (D. Colo. 1993) (stating that a determination that a defendant is entitled to qualified immunity on the underlying constitutional claims means, "by definition, Plaintiff [ ] fail[s] to state a claim for conspiracy").

## D.    The Denver Defendants' Motion

Generally, the claims remaining against the Denver Defendants (Officers Barrett, Desel, Dixon, Lopez, O'Neill, Rembert, Smith, and Speelman, and the City and County of Denver) are as follows: § 1983 malicious prosecution and § 1983 conspiracy to commit the malicious prosecution; § 1983 unreasonable search and seizure and § 1983 conspiracy to commit unreasonable search and seizure; § 1983 excessive force; and § 1983 municipal liability. *See generally Third Am. Compl.* [#254] at 16-23. With one exception in connection with a claim against Defendant Lucio based on events occurring throughout 2008 and

2009, the claims against the Denver Defendants primarily arise out of events occurring on

five dates: (1) April 29, 2009, (2) October 13, 2009, (3) April 5, 2010, (4) August 24, 2010,

and (5) August 28, 2010.  *See id.*

### 1.    2008-2009 Events

The only claim asserted against Defendant Lucio based on events in 2008 and 2009

is for malicious prosecution.  *Third Am. Compl.* [#254] at 16-17.  Defendant Lucio, a Denver

Police Department detective, first encountered Plaintiff in March 2008.  *Ex. B, Depo. of Pl.*

[#700-2] at 147-48 ("Lucio came into the picture in 2008, roughly around March."); *Ex. C,*

*Decl. of Lucio* [#700-3] ¶ 3 ("I first became aware of Plaintiff Dean Carbajal in March 2008

when I was tasked with apprehending him on a warrant relating to domestic violence.").

In part, Plaintiff states:

> [Defendant] Lucio . . . vigorously and maliciously pursued Mr. Carbajal, going
> to his residence, school, and community in Denver, Colorado, making false
> and slanderous statements to peers, neighbors, school officials and landlord,
> with the purpose and belief that these individuals would alienate Mr. Carbajal
> and cast him out, with no legal or justifiable reason, but based on a
> predisposition derived from Lucio's false and slanderous statements, placing
> a stigma on Mr. Carbajal and violating his liberty rights, secured under the
> 14th Amend. with the objective of destroying his stability and compelling his
> revocation by destroying his ability to function in society.  Mr. Carbajal was
> evicted and alienated by his friends and family based on Lucio['s] . . . actions.
> Lucio repeatedly slandered Mr. Carbajal making false statements that "Mr.
> Carbajal is a sexual predator that had not registered." . . .  Ultimately, Mr.
> Carbajal was forced to quit his job, drop out of school, and was evicted from
> his apartment, and alienated by his family and community, leaving him
> homeless in a shelter, and completely destroyed emotionally, mentally,
> socially, and financially.  Mr. Carbajal's ability to function in society was
> damaged and compelled revocation,[13] forcing him into exile with extreme
> fear and psychological trauma.

---

[13] It is unclear whether this is a scrivener's error and Plaintiff meant that he was compelled
to relocate, or whether he means he was compelled to find a new vocation, i.e., a new career.

> Lucio . . . knew that Mr. Carbajal was an innocent man exercising his right to life, liberty, peace and pursuit of happiness, and that no legal grounds or legitimate purpose existed to deprive him of these rights, but [he] still sought to institute legal process and compel the revocation of Mr. Carbajal's deferred sentence by manipulating and coercing [a witness] to falsify charges that Mr. Carbajal trespassed and violated a protection order . . .

*Third Am. Compl.* [#254] at 10.

The only claims based on these events are for § 1983 malicious prosecution and § 1983 conspiracy to commit malicious prosecution. *Id.* at 16-17. These are asserted under the Fourteenth Amendment. *See Recommendation* [#69] at 15; *Order* [#390] (affirming Recommendation in relevant part).

Defendant Lucio argues that this claim is foreclosed by *Myers v. Koopman*, 738 F.3d 1190, 1193 (10th Cir. 2014). In that case, the plaintiff alleged that the defendant "conjured up facts to create the illusion of probable cause for an arrest warrant and subsequent prosecution." *Myers*, 738 at 1193. The Tenth Circuit held:

> The district court rightly rejected [the plaintiff's] Fourteenth Amendment malicious-prosecution claim under 42 U.S.C. § 1983 because Colorado law provides an adequate remedy. The Fourteenth Amendment protects individuals against deprivations of liberty without due process of law. If a state actor's harmful conduct is unauthorized and thus could not be anticipated pre-deprivation, then an adequate post-deprivation remedy—such as a state tort claim—will satisfy due process requirements. . . . [The] lawlessness [alleged by the plaintiff] could not have been anticipated or prevented pre-deprivation, but a post-deprivation malicious-prosecution claim serves as an effective antidote. Colorado law provides that remedy. The existence of the state remedy flattens the Fourteenth Amendment peg on which [the plaintiff] now tries to hang his § 1983 malicious-prosecution claim. . . . Due process has been duly satisfied.

*Id.* (internal citations omitted).

The circumstances here are materially identical to those in *Myers*. Even if, arguendo, the Court were to credit all of Plaintiff's statements as being non-conclusory,

Plaintiff alleges at most that Defendant Lucio "conjured up facts to create the illusion of probable cause for an arrest warrant and subsequent prosecution." *See Myers*, 738 at 1193. Because Plaintiff has an adequate remedy under Colorado law, due process has been satisfied, and his federal malicious prosecution and related conspiracy claim both fail. *See Snell*, 920 F.2d at 701.

Accordingly, the Court **recommends** that judgment enter in favor of Defendant Lucio with respect to the claims of § 1983 malicious prosecution and § 1983 conspiracy to commit malicious prosecution based on events that allegedly occurred in 2008-2009.

### 2.      April 29, 2009 Incident

On April 28, 2009, at approximately 11:08 p.m., Defendant Dixon, a Denver Police Department sergeant, and his partner, non-party Officer Anthony Schluck ("Schluck"), were dispatched to respond to a noise complaint at 726 28th Street, Denver, Colorado. *Ex. D, Decl. of Dixon* [#700-4] ¶ 3; *Ex. E, 4.28.09 911 Recording* [#700-5] (conventionally-submitted material). After arriving at the scene, Officer Schluck spoke with the complainant, who confirmed her complaint and agreed to sign the General Session Summons and Complaint. *Ex. D, Decl. of Dixon* [#700-4] ¶ 3. The officers then approached the apartment from which the noise was emanating. *Id.* ¶ 5. Defendant Dixon began to knock on the door while Officer Schluck looked in through a window. *Id.* Officer Schluck reported seeing Plaintiff standing about five feet away from the door, but not opening the door. *Id.* The officers continued to knock on the door and to command Plaintiff to open the door, which he eventually did. *Id.*

After receiving approval from the officers' supervisor, Defendant Speelman (who was

a Denver Police Department sergeant), Plaintiff was charged with Interference in violation

of Denver Rev. Mun. Code § 38-31 for failing to open the door in response to the officers'

commands and Disturbing the Peace in violation of Denver Rev. Mun. Code § 38-39 for

playing loud music after 10 p.m.  *Id.* ¶ 6; *Ex. F, Decl. of Speelman* [#700-6] ¶ 4.  The

officers then took Plaintiff into custody without searching his residence.  *Ex. D, Decl. of*

*Dixon* [#700-4] ¶¶ 6, 12.  No force was used in arresting Plaintiff beyond the application of

handcuffs.  *Id.* ¶¶ 8-9;  *Ex. F, Decl. of Speelman* [#700-6] ¶ 6.  Plaintiff's booking

photographs, which were taken shortly after he was taken into custody, do not show any

evidence of being repeatedly struck in the head with the intent to cause him injury.  *Ex. H,*

*4.29.09 Booking Photos* [#700-8].  Officer Schluck and Defendant Dixon were the only

Denver Police Department officers present at Plaintiff's residence on April 29, 2009.  *Ex.*

*D, Decl. of Dixon* [#700-4] ¶ 13; *Ex. F, Decl. of Speelman* [#700-6] ¶¶ 4-5; *Ex. I, Decl. of*

*Barrett* [#700-9] 3-5; *Ex. J, Decl. of Desel* [#700-10] ¶¶ 2-7.

In contrast, Plaintiff states:

[Defendants] Speelman, Dixon, Desel, and Barrett broke open Mr. Carbajal's
door at the front entrance by force in absence of a warrant, consent, or
exigent circumstance, and charged up stairs at Mr. Carbajal.  Dixon or Barrett
forcefully grabbed and assaulted Mr. Carbajal slamming him to the stairs, as
the officers wrenched his shoulder, separating it, twisting his wrist, as he
repeatedly struck him in the head, causing him serious bodily injury to his
wrist, shoulder, and head, [and] instilling great emotional fear . . . .
Speelman, Desel, Dixon, or Barrett proceeded to illegally search and seize
Mr. Carbajal's property . . . .  Mr. Carbajal was arrested and dragged out of
his private home by Dixon or Barrett . . . .

Further . . . Speelman, Dixon, Desel, and Barrett intentionally falsified an
affidavit, stating that Mr. Carbajal was standing behind his front door and
refused to obey commands to open the door.  These falsities were
purposefully made to mislead judicial officers into issuing an arrest warrant
for Mr. Carbajal without probable cause.  More, these officers intentionally
omitted information that no warrant was present, that they broke open the

> door by force without consent and in the absence of exigent circumstances,
> that Mr. Carbajal was not behind the door, and that there was no evidence
> of a crime or ordinance violation . . . .

*Third Am. Compl.* [#254] at 12.  Plaintiff also asserts that $6,700.00 in money was taken by these four officers, as well as other valuables worth around $5,500.  *Id.* at 12 n.5.

The following claims remain with respect to the April 29, 2009 incident: § 1983 malicious prosecution, § 1983 conspiracy to commit malicious prosecution, § 1983 unreasonable search and seizure, § 1983 conspiracy to commit unreasonable search and seizure, and § 1983 excessive force.  *Third Am. Compl.* [#254] at 17-21.

With respect to malicious prosecution, Defendants argue that they had probable cause to arrest Plaintiff.  *Motion* [#700] at 18.  It is undisputed that the Denver Police Department received a call from Plaintiff's neighbor and that law enforcement officers were dispatched to look into the complaint.  *See Ex. E, Noise Complaint* [#705] (conventionally-submitted material).  It is also undisputed that Officer Schluck spoke directly with the complainant, who confirmed her complaint and agreed to sign the General Session Summons and Complaint.  *Ex. D, Decl. of Dixon* [#700-4] ¶ 3.  "Victim complaints may alone form a basis of probable cause."  *Marotta v. Cortez*, No. 08-cv-02421-CMA-CBS, 2009 WL 5491622, at *8 (D. Colo. Nov. 3, 2009) (collecting cases) (holding that "[t]he allegations of the [First Amended Complaint] and matters of public record are sufficient to establish probable cause of a violation of Denver Municipal Code, Sec. 38–39 Disturbance of the Peace").  Thus, probable cause existed for the officers to arrest Plaintiff.  Further, although issues of material fact exist regarding whether the officers also had probable cause to arrest Plaintiff for Interference, probable cause as to one charge (here, Disturbance of the Peace) is sufficient to justify arrest regardless of other charges.  *Moran*

*v. United States*, 404 F.2d 663, 666 (10th Cir. 1968).   There is no evidence that the Interference charge alone caused Plaintiff's continued confinement or prosecution.  *See Wilkins*, 528 F.3d at 799.

Accordingly, the Court **recommends** that judgment enter in favor of the Denver Officer Defendants on Plaintiff's claim for malicious prosecution regarding the April 29, 2009 incident.

With respect to unreasonable search and seizure, because Plaintiff's arrest was supported by probable cause, a limited search of the premises was permissible.  *See New York v. Belton*, 453 U.S. 454, 457 (1981) (stating that "a lawful custodial arrest creates a situation which justifies the contemporaneous search without a warrant of the person arrested and of the immediately surrounding area").   Searching the room in which Plaintiff was arrested is permissible.  *See United States v. Delay*, 121 F. App'x 359, 362 (10th Cir. 2005).

Further, the seizure of property incident to an arrest is proper under the Fourth Amendment.  *See United States v. Butler*, 904 F.2d 1482, 1485 (10th Cir. 1990).  Plaintiff asserts that $6,700.00 in money was taken by these four officers, as well as other valuables worth around $5,500.  *Third Am. Compl.* at 12 n.5.  He does not specify whether this property was taken as part of the investigation or whether the officers personally stole this property.  *See id.*  However, uncontroverted evidence from Defendant Dixon states that "[t]he only item we confiscated from Mr. Carbajal was his cell phone, which was returned to him."  *Ex. D, Decl. of Dixon* [#700-4] ¶ 12.  This statement is confirmed by Denver Police Department records.  *Ex. 3 to Decl. of Dixon* [#700-4] at 14.  Thus, in the absence of evidence to the contrary, Plaintiff's statement that $6,700.00 in money was taken by these

four officers, as well as other valuables worth around $5,500, must be interpreted to mean

that he alleges that the officers stole these items.

In October 15, 2010 (approximately a year and a half after this April 29, 2009

incident), the Tenth Circuit Court of Appeals held that at least as of September 2005, "there

was no clearly established law holding that a theft of money during the execution of a valid

search warrant violates the Fourth Amendment." *Springer v. Albin*, 398 F. App'x 427, 434

(10th Cir. 2010). The Tenth Circuit noted that there was no Tenth Circuit or Supreme Court

case law on point, and that other circuits had split on whether this was a constitutional

violation. *Id.* at 434-36. Two of the cases cited by the Tenth Circuit offer parallels to

Plaintiff's lawsuit:

> [I]n *Wagner v. Higgins*, 754 F.2d 186, 187 (6th Cir. 1985), the plaintiff filed a
> § 1983 action asserting that after he was arrested and his automobile was
> impounded, police officials stole personal property from the automobile in
> violation of his Fourth and Fourteenth Amendment rights. Noting that the
> plaintiff did not challenge his arrest or the impound of his vehicle as
> violating the Fourth Amendment, the Sixth Circuit determined that there was
> no Fourth Amendment violation for the inventory search. *Id.* at 189-90.
> Further, the court held that after *Parratt v. Taylor*, 451 U.S. 527 (1981), the
> plaintiff did not state a claim for relief under the Fourteenth Amendment and
> could seek return of the property under state conversion law. *Wagner*, 754
> F.2d at 187, 191-92.

> In comparison, the Fourth Circuit, in an unpublished case. determined that
> a theft of property constitutes a Fourth Amendment violation. In *Mom's Inc.
> v. Willman*, 109 F. App'x 629, 636-37 (4th Cir. 2004) (per curiam), the court
> held that the Fourth Amendment protected against the theft of a watch
> because the theft by the federal agents extended the seizure beyond its
> lawful duration. The court, however, also held that "those rights were not
> clearly established when the theft allegedly occurred." *Id.* at 636. Thus, the
> court determined that the federal agents were entitled to qualified immunity.
> *Id.* at 637.

*Id.* at 435-36. The Tenth Circuit concluded that "[g]iven the disparity of the law, we

conclude that it was not clearly established at the time of the search that the agents'

alleged conduct of stealing money after it was lawfully seized pursuant to a valid search warrant violated the Fourth Amendment." *Id.* at 436. The Court has also found no clearly established law as of April 2009 regarding the theft of money during a seizure incident to an arrest, as would be applicable to Plaintiff's claim here. Thus, even were the Court to find, arguendo, that the Denver Officer Defendants committed a constitutional violation, they are entitled to qualified immunity due to the absence of clearly-established law at the time of the asserted violation.

Accordingly, the Court **recommends** that judgment enter in favor of the Denver Officer Defendants on the unreasonable search and seizure claim.

Further, in the absence of underlying constitutional violations in connection with Plaintiffs' claims for malicious prosecution or unreasonable search and seizure, Plaintiff's related conspiracy claims also fail. *See Snell*, 920 F.2d at 701. Accordingly, the Court **recommends** that judgment enter in favor of the Denver Officer Defendants on the conspiracy claims asserted in connection with the April 29, 2009 incident.

With respect to excessive force, there is no evidence that Defendants Speelman or Desel took any action against Plaintiff. Accordingly, the Court **recommends** that summary judgment enter in their favor on this claim.

Plaintiff states that Defendants Barrett and Dixon used excessive force against him: "Dixon or Barrett forcefully grabbed and assaulted Mr. Carbajal slamming him to the stairs, as the officers wrenched his shoulder, separating it, twisting his wrist, as he repeatedly struck him in the head, causing him serious bodily injury to his wrist, shoulder, and head, [and] instilling great emotional fear . . . ." *Third Am. Compl.* [#254] at 12. There is no

evidence that Plaintiff posed a danger to himself or the officers at this time, or that he was attempting to escape or resist arrest, such that force of that magnitude may have been appropriate.  In light of the record before the Court at this time, Defendants Barrett and Dixon are not entitled to summary judgment on this claim.[14]

### 3.    October 13, 2009 Incident

Regarding an alleged incident involving Plaintiff on October 13, 2009 in Westminster, Colorado, none of the Denver Officer Defendants were present, nor did they play any role in planning or directing the incident.  *Ex. B, Depo. of Pl.* [#700-2] at 169 ("I specifically stated that I don't know who the specific officers were, but there's evidence to support based on 404(b) evidence and a pattern of conduct that [Defendant] Lucio and some of his officers potentially could have possibly done that."), 170 ("I don't have specific evidence nor do I know who specifically the officers were . . . ."); *Ex. C, Decl. of Lucio* [#700-3] ¶ 5 ("I did not personally participate in any interaction with [Plaintiff] in Westminster, Colorado on October 13, 2009.  I did not direct any officers to appear at [Plaintiff's] residence on that date and am not aware of any DPD interactions with [Plaintiff] on that date."); *Ex. F, Decl. of Speelman* [#700-6] ¶ 8 (same); *Ex. I, Decl. of Barrett* [#700-9] ¶ 6 (same).

In contrast, Plaintiff states that on October 13, 2009, Defendants Lucio, Quintana, and others conspired to violate Plaintiff's rights by having two other officers go to Plaintiff's residence and force their way in with guns drawn while they searched the residence, yelled profanities, and made slanderous statements about Plaintiff.  *Third Am. Compl.* [#254] at

---

[14] Defendants Barrett and Dixon do not argue that, if Plaintiff's version of events is accepted as true, that the law regarding excessive force under these circumstances was not clearly-established at the time of this incident.  Thus, they are not entitled to qualified immunity.  *See Plumhoff*, 134 S. Ct. at 2023.

13. Two members of Plaintiff's family were also present and also objected to the search. *Id.* No warrant was presented. *Id.*

The following claims remain with respect to the October 13, 2009, incident: § 1983 unreasonable search and seizure and § 1983 conspiracy to commit unreasonable search and seizure. *See id.* at 20. These claims suffer from the same problems discussed in analyzing the claims asserted against Defendant Quintana. *See* § III.B. First, although Defendant Lucio is named by Plaintiff, there is no evidence regarding any specific actions he took in 2009, either directly or indirectly in connection with the asserted search. Rather, two other officers apparently entered Plaintiff's home and took the actions described above. *See Third Am. Compl.* [#254] at 13. Thus, there is no evidence of Defendant Lucio's personal participation in the events asserted. *See Bennett*, 545 F.2d at 1262-63. Plaintiff's bald assertions regarding Defendant Lucio's alleged connection to this event do not constitute sufficient evidence such that a reasonable jury could resolve the issue in Plaintiff's favor. *See Anderson*, 477 U.S. at 248. Thus, both claims lack evidence against Defendant Lucio demonstrating that he acted unconstitutionally in connection with the October 13, 2009 incident.

Plaintiff does not name Defendants Barrett, Dixon, and Speelman in the recitation of facts in his Third Amended Complaint. However, he mentions their names in connection with this claim, in addition to the two unidentified officers mentioned above, when describing his causes of action. *See Third Am. Compl.* [#254] at 20. Again, though, there is no evidence of personal participation by Defendants Barrett, Dixon, and Speelman in connection with this event, and thus Plaintiff's claims here against them fail.

Accordingly, the Court **recommends** that judgment enter in favor of Defendants

Lucio, Barrett, Dixon, and Speelman on this claim.

Further, in the absence of an underlying constitutional violation in connection with unreasonable search and seizure, Plaintiff's related conspiracy claim also fails. *See Snell*, 920 F.2d at 701. Accordingly, the Court **recommends** that judgment enter in favor of the Denver Officer Defendants on the conspiracy claim asserted in connection with the October 13, 2009 incident.

### 4.    April 5, 2010 Incident

In the early morning hours of April 5, 2010, Defendant Rembert, a Denver Police Department technician, and non-party Officer Erik Golladay ("Golladay") were dispatched to a domestic violence call at 829 E. 25th Avenue. *Ex. L, Decl. of Rembert* [#700-12] ¶ 2. When they arrived, the victim, Irma Lorena Holguin-Hinojos ("Holguin-Hinojos"), was inside the address crying and obviously afraid. *Id.* She reported the following: (1) Plaintiff had hit her approximately six times at their former shared apartment at 2330 N. Broadway, Unit 404, Denver, Colorado; (2) he then began to drive Ms. Holguin-Hinojos to her mother's house at 829 E. 25th Avenue where they started arguing again and Ms. Holguin-Hinojos decided to exit the car; (3) before she could get out of the car, Plaintiff took her keys to her mother's residence; (4) her mother picked her up and took her back to the mother's residence; (5) later, Plaintiff let himself into the mother's residence using the stolen keys, grabbed Ms. Holguin-Hinojos and shoved her around while striking her in the chest, arms, and legs; and (6) Plaintiff eventually left and Ms. Holguin-Hinojos called the police. *Id.* During the 911 call placed by Ms. Holguin-Hinojos, she explained that in addition to beating her, Mr. Carbajal threatened to murder her along with members of her family. *Ex. M,*

*4.05.10 911 Recording* [#700-13] (conventionally-submitted material).

While Defendant Rembert was with Ms. Holguin-Hinojos, she received a call from a friend, Kyle Kellum ("Kellum"), who told her that Plaintiff was on his way back to the residence at 2330 N. Broadway. *Ex. L, Decl. of Rembert* [#700-12] ¶ 3. Ms. Holguin-Hinojos, who was the sole lease-holder to the premises, provided the officers with a key and gave them verbal consent to search the apartment. *Id.* Ms. Holguin-Hinojos also later signed a consent to search form. *Ex. N, Decl. of Smith* [#700-14] ¶ 6. Defendant Smith, a Denver Police Department officer, was dispatched to accompany Defendant Rembert to the 2330 N. Broadway apartment for the purpose of locating and arresting Plaintiff. *Id.* ¶ 2; *Ex. L, Decl. of Rembert* [#700-12] ¶ 3. Officer Golladay stayed with Ms. Holguin-Hinojos. *Ex. L, Decl. of Rembert* [#700-12] ¶ 3.

Defendants Smith and Rembert entered the apartment using the key provided by Ms. Holguin-Hinojos. *Id.* ¶ 4; *Ex. N, Decl. of Smith* [#700-14] ¶ 3. The officers announced their presence and, believing that Plaintiff was inside, began to look through the apartment for Plaintiff. *Id.* Defendant Rembert observed multiple marijuana pipes and a mirror with what he believed was cocaine residue on top of a table in the living room. *Ex. L, Decl. of Rembert* [#700-12] ¶ 4. The officers also discovered a bag of what appeared to be psychedelic mushrooms and multiple bags of cocaine sitting in an open safe. *Id.* While the officers were in the apartment, Plaintiff arrived with Mr. Kellum and Alyssa Mueller ("Mueller"). *Id.* ¶ 5; *Ex. N, Decl. of Smith* [#700-14] ¶ 4. After they identified themselves, Defendant Rembert asked Plaintiff whether he lived at the apartment and Plaintiff responded, "this isn't my apartment" and "I don't live here." *Ex. L, Decl. of Rembert* [#700-12] ¶ 5; *Ex. N, Decl. of Smith* [#700-14] ¶ 5. Defendant Rembert then asked Plaintiff

-42-

whether he kept any personal belongings in the apartment and Plaintiff responded, "No, this is my girlfriend's place" and "I don't have anything in there." *Ex. L, Decl. of Rembert* [#700-12] ¶ 5.  The officers then called District 6 Narcotics Unit officers to the scene.  *Id.*  ¶ 6.

Plaintiff, Mr. Kellum, and Ms. Mueller were read their *Miranda* rights and agreed to provide statements.  *Id.* ¶¶ 7-9.  Ms. Mueller stated that she believed that the apartment belonged to Ms. Holguin-Hinojos and denied knowledge of the narcotics.  *Ex. N, Decl. of Smith* [#700-14] ¶ 7.  Mr. Kellum stated that the narcotics located in the apartment belonged to Plaintiff and that Plaintiff was a narcotics dealer.  *Ex. L, Decl. of Rembert* [#700-12] ¶ 8.  Ms. Mueller and Mr. Kellum each signed forms consenting to a search and provided separate written statements.  *Ex. N, Decl. of Smith* [#700-14] ¶ 4; *see also Ex. 2* [#700-4] at 14-15 (statement of Mr. Kellum stating that he had stayed in the apartment the night of April 3-4, 2010, that he was planning on staying the night of April 4-5, 2010, and that he had a few boxes and some clothes at the apartment), at 17 (statement of Ms. Mueller that she had stayed at the apartment the night of April 3-4, 2010).  Plaintiff continued to deny that he lived at or ever spent the night at the apartment.  *Ex. L, Decl. of Rembert* [#700-12] ¶ 9.

Plaintiff was taken into custody and transported to the District 6 police station by other officers.  *Id.* ¶ 10.  Defendants Rembert and Smith remained at the scene to take photographs.  *Id.*; *Ex. N, Decl. of Smith* [#700-14] ¶ 4.  Defendant Rembert transported the narcotics to the evidence bureau after all of the proper paperwork was completed.  *Ex. L, Decl. of Rembert* [#700-12] ¶ 10.  Neither officer observed or seized any money from the apartment.  *Id.* ¶ 11; *Ex. N, Decl. of Smith* [#700-14] ¶ 8.  Although the drug charges against Plaintiff were dismissed, he was convicted of First Degree Criminal Trespass and

two counts of Third Degree Assault arising from the events of April 4-5, 2010. *Ex. O, Court File 2010CR1576* [#700-15]. Defendants Lucio, Speelman, and Barrett were not present for and did not personally participate in any aspect of Plaintiff's arrest on April 5, 2010. *Ex. C, Decl. of Lucio* [#700-3] ¶ 6; *Ex. F, Decl. of Speelman* [#700-6] ¶ 9; *Ex. I, Decl. of Barrett* [#700-9] ¶ 7; *Ex. L, Decl. of Rembert* [#700-12] ¶¶ 12-14; *Ex. N, Decl. of Smith* [#700-14] ¶¶ 9-11.

In contrast, Plaintiff states that on April 5, 2010, Defendants Lucio, Speelman, Barrett, Rembert, and Smith, conspired to violate his constitutional rights. *Third Am. Compl.* [#254] at 13. Defendants Rembert and Smith "staged a crime scene by positioning a safe that allegedly contained illegal drugs on a table in plain view, and falsified statements . . . , fabricated to mislead and deceive judicial officers into instituting legal proceedings for the alleged crime[s] of possession and distribution of a controlled substance." *Id.* Plaintiff asserts that these two officers seized about $4,500.00 and a computer and other electronics including professional camera equipment, and damaged his property in the amount of about $12,000.00. *Id.* at 13 n.6, 14. Plaintiff states the officers failed to inform judicial officers that the safe was actually hidden behind a couch "with the personal and private possessions of Kyle Kellum's in his private space, a person that had just taken over the residence, and was subleasing this apartment . . . ." *Id.* at 14.

The following claims remain with respect to the April 5, 2010 incident: § 1983 malicious prosecution, § 1983 conspiracy to commit malicious prosecution, § 1983 unreasonable search and seizure, and § 1983 conspiracy to commit unreasonable search and seizure. *Id.* at 16, 18-20.

With respect to the malicious prosecution claims for Distribution and Possession of

a Controlled Substance, Plaintiff has not demonstrated that this charge alone was the cause of any continued confinement or prosecution. As noted above, probable cause as to one charge (here, the domestic violence charge) is sufficient to justify arrest regardless of other charges. *See Moran*, 404 F.2d at 666. There is no evidence that the Distribution and Possession of a Controlled Substance charges alone caused Plaintiff's continued confinement or prosecution. *See Wilkins*, 528 F.3d at 799.

Accordingly, the Court **recommends** that judgment enter in favor of the Denver Officer Defendants on the malicious prosecution claim.

With respect to the unreasonable search and seizure claims, there is no evidence that Ms. Holguin-Hinojos was not the lessee of the apartment on April 5, 2010, or that she did not voluntarily give officers her key and consent to search. Even if, arguendo, Ms. Holguin-Hinojos did not have actual authority to give permission to the officers to search the apartment, " a third party has apparent authority to consent to a search if a police officer reasonably, but erroneously, believes that the third party has actual authority to consent." *United States v. Cos*, 498 F.3d 1115, 1128 (10th Cir. 2007). The apparent authority inquiry is an objective one where the Court must determine whether "the facts available to the officer at the moment . . . warrant a man of reasonable caution [to believe] that the consenting authority had authority over the premises[.]" *Id.* (quoting *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990)). A third party has apparent authority if the officer has a reasonable belief that the third party has "(1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it." *Cos*, 498 F.3d at 1128 (quoting *United States v. Rith*, 164 F.3d 1323, 1329 (10th Cir. 1999)). Here, given that Ms. Holguin-Hinojos provided the officers with a key, there is no evidence that the officers lacked a reasonable

belief that she did not have mutual use of the property by virtue of joint access. *See id.*

With respect to the seizure, Plaintiff asserts that these two officers seized about $4,500.00, a computer, and professional camera equipment, and damaged his property in the amount of about $12,000.00. *Third Am. Compl.* [#254] at 13 n.6, 14. To the extent Plaintiff asserts his property was damaged, Plaintiff merely baldly asserts that property was damaged in the amount of $12,000.00, with no further explanation or evidence regarding what the property was or how that figure was reached. *See id.* This single, vague, conclusory statement does not constitute sufficient evidence such that a reasonable jury could resolve the issue in Plaintiff's favor. *See Anderson*, 477 U.S. at 248.

With respect to the money, computer, and camera equipment, Plaintiff does not specify whether this property was taken as part of the investigation or whether the officers personally stole this property. *See Third Am. Compl.* [#254] at 13 n.6, 14. However, uncontroverted evidence from Defendant Smith states that, "I do not recall seeing any cash present at the scene." *Ex. N, Decl. of Smith* [#700-14] ¶ 8; *see also Ex. L, Decl. of Rembert* [#700-12] ¶ 11. This statement is confirmed by Denver Police Department records, which does not list any cash, computer, or camera equipment as having been seized. *Ex. 4 to Decl. of Smith* [#700-14] at 16. Thus, in the absence of evidence to the contrary, Plaintiff's statement that these two officers seized about $4,500.00, a computer, and professional camera equipment must be interpreted to mean that he alleges that the officers stole these items. However, on October 15, 2010 (more than six months after this April 5, 2010 incident), the Tenth Circuit Court of Appeals held that "there was no clearly established law holding that a theft of money during the execution of a valid search warrant violates the Fourth Amendment." *Springer*, 398 F. App'x at 434. The Court has found no clearly

established law as of April 2010 regarding alleged theft of electronics which is to the contrary to the holding of *Springer*. Thus, even were the Court to find, arguendo, that these Denver Officer Defendants committed a constitutional violation, they are entitled to qualified immunity due to the absence of clearly-established law at the time of the asserted violation.

Accordingly, the Court **recommends** that judgment enter in favor of the Denver Officer Defendants on the unreasonable search and seizure.

Further, in the absence of underlying constitutional violations in connection with malicious prosecution or unreasonable search and seizure, Plaintiff's related conspiracy claim also fails. *See Snell*, 920 F.2d at 701. Accordingly, the Court **recommends** that judgment enter in favor of the Denver Officer Defendants on the conspiracy claim asserted in connection with the April 5, 2010 incident.

### 5.    August 24, 2010 Incident

A single claim of § 1983 excessive force remains with respect to the August 24, 2010 incident. On August 24, 2010, Plaintiff asserts that Defendant Watts hit Plaintiff with his vehicle near 22nd Street and Glenarm Place in Denver. *Ex. B, Depo. of Pl.* [#700-2] at 206-14, 228-29. Defendant Lucio was neither present nor in any way involved in this incident. *Id.* (providing subjective belief that Defendant Watts may have hit Plaintiff because Defendant Watts knew that Plaintiff had had negative encounters with Defendant Lucio in the past); *Ex. C, Decl. of Lucio* [#700-3] ¶ 7. Although Plaintiff conclusorily asserts that Defendant Lucio conspired with Defendant Watts and others to violate Plaintiff's rights on August 24, 2010, Plaintiff does not demonstrate that Defendants Watts took any action or that Plaintiff can establish any of the elements of an excessive force claim. *See Third*

*Am. Compl.* [#254] at 14-15.

Accordingly, the Court **recommends** that judgment enter in favor of Defendant Lucio on this claim.

### 6.   August 28, 2010 Incident

On August 28, 2010, Plaintiff was wanted on a number of warrants relating to a variety of crimes including another incident of domestic violence against Ms. Holguin-Hinojos and violation of a protective order stemming from his actions two days earlier on August 26, 2010.[15]   *Ex. C, Decl. of Lucio* [#700-3] ¶ 8; *Ex. P, Decl. of O'Neill* [#700-16] ¶ 3; *Ex. Q, Decl. of Lopez* [#700-17] ¶ 3.   Defendant Lucio was monitoring Ms. Holguin-Hinojos's residence based on cellular phone tracking data, which indicated that Plaintiff was in the area.  *Ex. C, Decl. of Lucio* [#700-3] ¶ 8; *Ex. P, Decl. of O'Neill* [#700-16] ¶ 4; *Ex. Q, Decl. of Lopez* [#700-17] ¶ 5-6.   Defendant Lucio saw Plaintiff exit the backdoor of the residence, take off running, and enter a vehicle.  *Ex. C, Decl. of Lucio* [#700-3] ¶ 8; *Ex. P, Decl. of O'Neill* [#700-16] ¶ 4; *Ex. Q, Decl. of Lopez* [#700-17] ¶ 6.   Defendant Lucio—via his radio—alerted other nearby officers that he had located Plaintiff and provided information regarding the direction in which the vehicle was traveling.  *Ex. C, Decl. of Lucio* [#700-3] ¶ 8; *Ex. P, Decl. of O'Neill* [#700-16] ¶ 4; *Ex. Q, Decl. of Lopez* [#700-17] ¶ 6.   Defendant O'Neill, a Denver Police Department detective, was in his police vehicle and near the location Defendant Lucio indicated, so he started to look for Plaintiff.  *Ex. P, Decl. of O'Neill* [#700-16] ¶ 5.   Defendant O'Neill intercepted a vehicle near 26th and

---

[15]   It is unclear whether Defendant Lucio's affidavit meant to refer to the August 24, 2010 incident and whether the dates of August 24 or August 26 are incorrect, or whether this refers to a separate unidentified incident.  Regardless, the issue is immaterial for resolution of this portion of the Motion [#700].

Downing and could see Plaintiff sitting in the front passenger seat of the vehicle. *Id.* Plaintiff had blood on his face. *Id.* Plaintiff jumped out of the stopped car and started running. *Id.* Defendant O'Neill caught up to Plaintiff as he was attempting to climb onto the low roof of a garage and was able to grab him by the ankles and pull him off the roof. *Id.* ¶ 6; *Ex. Q, Decl. of Lopez* [#700-17] ¶ 8. Plaintiff landed on his feet and immediately dropped to the ground. *Ex. P, Decl. of O'Neill* [#700-16] ¶ 7. Plaintiff and Defendant O'Neill struggled for a few seconds until Detective O'Neill was able to get Plaintiff handcuffed. *Id.*; *Ex. Q, Decl. of Lopez* [#700-17] ¶ 8. Defendants Lopez and Lucio arrived as Detective O'Neill was handcuffing Plaintiff, and neither one punched, kicked, or otherwise struck Plaintiff at any point during the incident. *Ex. C, Decl. of Lucio* [#700-3] ¶¶ 10-11; *Ex. P, Decl. of O'Neill* [#700-16] ¶¶ 10-12; *Ex. Q, Decl. of Lopez* [#700-17] ¶¶ 9-10. Detective O'Neill did not punch, kick, or otherwise strike Plaintiff at any point during the incident. *Ex. P, Decl. of O'Neill* [#700-1] ¶ 10.

At the time he was arrested, Plaintiff was bleeding from lacerations on his face. *Ex. P, Decl. of O'Neill* [#700-16] ¶ 8; *Ex. Q, Decl. of Lopez* [#700-17] ¶ 11. Defendant O'Neill asked Plaintiff how his injuries occurred and he responded that someone struck him with a bar and that he had been involved in a car accident. *Ex. P, Decl. of O'Neill* [#700-16] ¶ 8. Plaintiff did not lose consciousness, but acted as though he was disoriented and confused about where he was. *Ex. Q, Decl. of Lopez* [#700-17] ¶ 11. Paramedics were called to treat Plaintiff and an Injury Prior to Arrest report was completed. *Id.* ¶¶ 11, 13; *Ex. P, Decl. of O'Neill* [#700-16] ¶ 9. Plaintiff left the scene in an ambulance and was taken to the St. Anthony Hospital Emergency Department to be treated for the lacerations to his face and any unknown injuries sustained prior to his arrest. *See generally Ex. R, Pl.'s*

*Medical Records* [#701].  Plaintiff initially reported to his medical providers that his injuries were self-inflicted and then later claimed they were caused by the police.  *Id.* at 1.  The medical professionals at the hospital determined that Plaintiff had sustained only superficial lacerations on his head and had no other injuries.  *Id.* at 2.  Diagnostic tests performed by hospital staff confirmed that Plaintiff had both alcohol and cocaine in his system.  *Id.* at 3. Plaintiff's primary diagnosis was cocaine abuse with secondary diagnoses including alcohol abuse, head injury, and scalp laceration.  *Id.* at 5.  Plaintiff's booking photographs, which were taken approximately six hours after his arrest, do not show any bruising on his face. *Ex. S, 8.28.10 Booking Photos* [#700-19].  Additionally, shortly after being transferred to the custody of the Denver Sheriff Department, Plaintiff was screened for injuries and medical issues.  *Ex. T, Denver Sheriff Dep't Health Servs. Questionnaire* [#702].  The form completed by the nurse who performed the screening does not indicate any bruising on Plaintiff's face, head or body.  *See id.*

After Plaintiff departed the scene in an ambulance, Defendants Lucio and Lopez went back to Ms. Holguin-Hinojos's residence where they discovered a broken window which led into the kitchen of the apartment.  *Ex. C, Decl. of Lucio* [#700-3] ¶ 12; *Ex. Q, Decl. of Lopez* [#700-17] ¶ 14.  Further inspection lead to the discovery of blood on the broken window, multiple locations within the kitchen and the back door steps.  *Id.* Photographs were taken of the scene documenting the location of the blood evidence.  *Ex. C, Decl. of Lucio* [#700-3] ¶ 13.  DNA analysis confirmed that the blood located within the apartment was in fact Plaintiff's.  *Ex. W, DPD Crime Lab Report* [#700-23].  Plaintiff was convicted of two counts of burglary, two counts of trespassing, kidnapping, stalking, and multiple violations of a protection order and bail bond conditions relating to events that

occurred in the days immediately prior to and on the day of his arrest on August 28, 2010. *Ex. X, Court File 2010CR3824* [#700-24] at 5-11.

In contrast, Plaintiff states that Defendants Lopez and O'Neill arrested Plaintiff and placed him face down on the ground, despite the fact that Plaintiff was compliant and posed no threat. *Third Am. Compl.* [#254] at 15. While he was cuffed and on the ground, Plaintiff alleges that these two officers struck him with a gun in the temple and began to brutally and recklessly beat him. *Id.* Defendant Lucio also appeared and began to kick Plaintiff repeatedly. *Id.* Plaintiff states that he was left unconscious in a puddle of blood. *Id.* When he awoke, the three officers were still beating him, but they stopped when other officers and the paramedics arrived.[16] *Id.* The officers attempted to hide Plaintiff and told the paramedics that he did not need medical attention. *Id.* Plaintiff says that he sustained injuries to his head, back, and ribs, as well as emotional trauma. *Id.* He further asserts that Defendants O'Neill and Lopez seized $4,000.00 and a watch from him. *Id.*

The following claims remain with respect to the August 28, 2010 incident: § 1983

---

[16] Plaintiff filed another lawsuit, Civil Action No. 12-cv-02257-PAB-KLM, related to an alleged forced catheterization which occurred at the hospital in connection with these events. At the trial in that case, Plaintiff testified under oath that after he was handcuffed and lying on the ground: "[T]he officer looks at my passport. He said, 'Oh, Mr. Carbajal.' . . . All I remember then is being struck in the head with what I believed was a pipe, but I believe now it was a pistol, just by the nature of the wound to the side of my left head [sic]. I had a torn piece of flesh that was in an L shape that was pushing into my skull. . . . He kept hitting me, kept kicking me, kept hitting me in the head. At this point in time, I believe I lost consciousness for a second or two, and I woke up to see an individual that I recognized as Mr. Lucio. . . . When I turned around and I identified this person and I recognized him, I just curled up in a ball and kept taking it. This individual, Mr. Lucio, kept kicking me. Eventually, I heard a scream from somebody or something that paused or stopped these people [sic]." *Transcript of Jury Trial–Day Three* [#417] at 599-600. The jury found that neither Defendants Lopez nor O'Neill used excessive force against Plaintiff after he was transported to the hospital for care. [#386]. Further, in ruling on a post-trial request for attorneys' fees, the Court found that Plaintiffs "testimony was not merely wholly *in*credible but bordered on perjurious." [#404] at 5.

unreasonable search and seizure, § 1983 conspiracy to commit unreasonable search and seizure, and § 1983 excessive force.[17]

The unreasonable search and seizure claim is predicated on the alleged theft of property by Defendants Lucio, O'Neill, and Lopez. *See Third Am. Compl.* [#254] at 20. First, the Court rejects Defendants' argument that there is no evidence that this property ever existed. *See Motion* [#700] at 25. Plaintiff's Third Amended Complaint, construed as an affidavit as earlier discussed, clearly states in a non-conclusory fashion that the watch and $4,000.00 existed. *See Third Am. Compl.* [#254] at 15. The seizure of property incident to an arrest is proper under the Fourth Amendment. *See Butler*, 904 F.2d at 1485. Plaintiff argues, though, that these Defendants stole his watch and money. However, on October 15, 2010 (approximately seven weeks after this incident), the Tenth Circuit Court of Appeals held that "there was no clearly established law holding that a theft of money during the execution of a valid search warrant violates the Fourth Amendment." *Springer*, 398 F. App'x at 434. Although Plaintiff's situation here involved a warrantless search of his person incident to an arrest, the Court has found no authority as of August 2010 clearly establishing that the theft of personal property under these circumstances constitutes a constitutional violation. Given this absence of explicit authority, along with the supporting authority of *Springer*, the Court determines that, even were the Court to find that

---

[17] The claims asserted against the same Denver Officer Defendants by Plaintiff in Civil Action No. 12-cv-02257-PAB-KLM stem from actions occurring after Plaintiff was transported to a hospital for care. *See generally Am. Compl.* [#60] in Civil Action No. 12-cv-02257-PAB-KLM. That lawsuit did not include claims based on events occurring before Plaintiff's transport. Nevertheless, Plaintiff was permitted to testify, as outlined in footnote 16, about some of the pre-transport events in the previous lawsuit. After hearing both that testimony and Plaintiff's testimony regarding events at the hospital, the jury found in favor of Officers Lopez, Lucio, and O'Neill on Plaintiff's excessive force claims.

Defendants Lucio, O'Neill, and Lopez committed a constitutional violation, they are entitled to qualified immunity due to the absence of clearly-established law at the time of the asserted violation.

Accordingly, the Court **recommends** that judgment enter in favor of Defendants Lucio, O'Neill, and Lopez on this claim.

Further, in the absence of an underlying constitutional violation in connection with unreasonable search and seizure, Plaintiff's related conspiracy claim also fails. *See Snell*, 920 F.2d at 701. Accordingly, the Court **recommends** that judgment enter in favor of the Denver Officer Defendants on the conspiracy claim asserted in connection with the August 28, 2010 incident.

Turning to the excessive force claim, the Denver Officer Defendants correctly point out that "the parties offer conflicting accounts with respect to this issue." *Motion* [#700] at 27. However, they argue that "the fictitious nature of Plaintiff's claims is . . . apparent" and under *Scott v. Harris*, 550 U.S. 372, 380 (2007), should be disregarded. Judge Blackburn recently addressed a similar argument raised by the law enforcement defendants in another of Plaintiff's cases, 12-cv-02257-REB-KLM. There, in response to objections to a Recommendation that certain excessive force claims survive summary judgment, he stated:

> [T]he exception recognized in *Scott* to the general principle that evidence on summary judgment must be viewed in the light most favorable to the nonmoving party applies only in the exceedingly rare instance when the nonmovant's evidence is "blatantly contradicted" by the record. In *Scott* and cases which have applied it, such blatant contradiction took the form of an incontrovertible video or audio recording of relevant events. Lacking such hard evidence here, the Denver defendants' arguments amount to little more than the assertion that Mr. Carbajal's version of events is not credible. Yet

credibility determinations are particularly unsuited for resolution by summary judgment.

*Carbajal v. St. Anthony Central Hosp.*, No. 12-cv-002257-REB-KLM, 2015 WL 3896902, at *2 (D. Colo. June 23, 2015) (internal citations and footnotes omitted).  The Court further held that "[t]he mere fact that Mr. Carbajal's version of events differs markedly from defendants' recollections does not in itself render his account implausible."  *Id.* at *2 n.4 (noting that Plaintiff had not alleged "that the moon is made of green cheese or that he was abducted by aliens").[18]

Plaintiff has therefore raised a genuine issue of material fact concerning whether excessive force was used against him on August 28, 2010, but only with respect to Defendants Lucio and O'Neill.[19]  As noted by Defendants, this same analysis does not apply to Defendant Lopez.  Plaintiff testified in his deposition: "[F]rom the reports and from what I've seen, the only other person that was allegedly there was Jay Lopez.  So I'm assuming he was involved in the assault to some extent, but apart from that, I don't recall specifically any other individual striking me apart from O'Neill and Lucio."  *Depo. of Pl.* [#700-2] at 270.  When counsel asked Plaintiff, "[Y]ou didn't see Detective Lopez actually strike you, correct?", Plaintiff responded, "Lopez? No."  *Id.*  Thus, there appears to be no

---

[18]  To the extent Plaintiff's statements here may be contradicted by his statements made at trial under oath in Civil Action No. 12-cv-02257-PAB-KLM, the exception addressed in *Scott* appears not to apply because Plaintiff's testimony there is not "incontrovertible," like a video or audio recording.  *Carbajal*, 2015 WL 3896902, at *2.  However, to the extent permitted by the trial judge, Defendants may use Plaintiff's trial testimony from Civil Action No. 12-cv-02257-PAB-KLM for impeachment purposes.  *See* Fed. R. Evid. 613(b).

[19]  Defendants Lucio and O'Neill do not argue that, if Plaintiff's version of events is accepted as true, the law regarding excessive force under these circumstances was not clearly-established at the time of this incident.  Thus, they are not entitled to qualified immunity.  *See Plumhoff*, 134 S. Ct. at 2023.

evidence in the record before the Court that Lopez personally employed excessive force against Plaintiff.

Accordingly, the Court **recommends** that judgment enter in favor of Defendants Lucio, Lopez, and O'Neill on the claims of § 1983 unreasonable search and seizure and § 1983 conspiracy to commit unreasonable search and seizure. The Court further **recommends** that judgment enter in favor of Defendant Lopez on the claim of § 1983 excessive force. The Court further **recommends** that the Motion [#700] be **denied** to the extent Defendants Lucio and O'Neill seek summary judgment on the claim of § 1983 excessive force in connection with the August 28, 2010 incident.

### 7.   Municipal Liability

Based on the foregoing discussion, judgment should enter in favor of the Denver Officer Defendants on all claims except for excessive force against Defendants Barrett and Dixon in connection with the April 29, 2009 incident and against Defendants Lucio and O'Neill in connection with the August 28, 2010 incident. Thus, any municipal liability claim with respect to the other claims must necessarily fail. *See Wilson v. Meeks*, 98 F.3d 1247, 1255 (10th Cir.1996) (quoting *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978)) ("[M]unicipalities may not be held liable 'unless actions pursuant to official municipal policy of some nature caused a constitutional tort.'").

Turning to the remaining excessive force claims, there is no evidence of any specific policy, custom, or act which could support these claims, despite Plaintiff's conclusory statements to the contrary. *Third Am. Compl.* [#254] at 23. Even if, arguendo, his statements could be construed as sufficient evidence to identify a policy, custom, or act,

there is no evidence of a causal connection between the policy, custom, or act and the alleged excessive force used by these officers on April 29, 2009 and August 28, 2010.  In the absence of such evidence, municipal liability may not be imposed on the City and County of Denver.  *See, e.g.*, *Estate of Bleck v. City of Alamosa*, 105 F. Supp. 3d 1222, 1229-31 (D. Colo. 2015).

Accordingly, the Court **recommends** that judgment enter in favor of the City and County of Denver on all aspects of Plaintiff's municipal liability claim.

## IV.  Conclusion

For the foregoing reasons, the Court respectfully **RECOMMENDS** the State Defendants' Motion [#694] be **GRANTED**, that Defendant Watts' Motion [#697] be **GRANTED**, that the Denver Defendants' Motion [#700] be **GRANTED in part and DENIED in part**, and that the Delta Defendants' Motion [#714] be **GRANTED**.[20]

IT IS **ORDERED** that pursuant to Fed. R. Civ. P. 72, the parties shall have fourteen (14) days after service of this Recommendation to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned.  A party's failure to serve and file specific, written objections waives de novo review of the Recommendation by the District Judge, Fed. R. Civ. P.  72(b); *Thomas v. Arn*, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions. *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996).  A party's objections to this Recommendation must

---

[20] If this Recommendation is adopted in full, the claims remaining will be (1) excessive force against Defendants Barrett and Dixon in their individual capacities regarding the April 29, 2009 incident, and (2) excessive force against Defendants Lucio and O'Neill in their individual capacities regarding the August 28, 2010 incident.

be both timely and specific to preserve an issue for de novo review by the District Court or for appellate review.  *United States v. One Parcel of Real Prop.*, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated February 17, 2016, at Denver, Colorado.

BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge